Alan E. MORRIS, Plaintiff,

v.

Paul GILBERT and Reich & Co., Inc., Defendants.

No. 85 Civ. 1728.

United States District Court, E.D. New York.

Dec. 23, 1986.

Lawrence Greenapple, Bobrow Greenapple & Skolnik, New York City, for plaintiff.

Stephen M. Rathkopf, (Felice F. Mischel, of counsel), Demov, Morris & Hammerling, New York City, for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

### I. *Background*

Defendants Paul Gilbert ("Gilbert") and Reich & Co., Inc. ("Reich") move on a variety of grounds against the amended complaint of plaintiff Alan E. Morris ("Morris").[1] During the relevant time periods,

---

1. Morris's original complaint included twenty-nine claims. When Gilbert and Reich first

Gilbert was an employee of Reich, a brokerage firm. Morris opened a brokerage account at the firm.

Although his amended complaint sets forth thirty claims, Morris makes three essential allegations: (1) beginning in December 1982, Gilbert induced Morris to purchase and sell securities and enter other transactions on the representation that he—Gilbert—was a registered representative of Reich; in fact, Morris alleges, Gilbert did not become a registered representative of Reich until August 1983, and Morris relied on the misrepresentation to his detriment; (2) in June 1983, Gilbert recommended that Morris purchase shares of Telesphere International Inc. ("Telesphere") and Biotech Research Labs Inc. ("Biotech") in anticipation of stock splits that Gilbert said he knew would take place; in fact, Morris alleges, the stocks did not split, and he was damaged by his reliance on the erroneous recommendation; (3) although Morris's account with Reich was not a discretionary account, Gilbert made discretionary trades during the period from December 1982 to February 1985, notwithstanding Morris's instructions that no trades should be effected without his prior authority.

II. *Conversion to Summary Judgment*

Morris's three essential allegations metamorphosed into thirty claims—some against both defendants, some against Gilbert alone, and some against Reich alone—under several legal theories, including federal securities laws, RICO, a New York statute, and a series of common law causes of action. Although the defendants move to dismiss the complaint, they have also introduced matters outside the pleading. Thus, there are two affidavits from Gilbert saying that Morris was never defrauded, a power of attorney executed by Morris in favor of Gilbert, and copies of brokerage statements. Withal, the defendants maintain that the motion has not been converted to one for summary judgment, because the amended complaint is so infirm as to compel dismissal before the court even decides whether to consider material outside the pleading. Defendants' Reply Memorandum of Law at 3 & n. *.

■ A motion to dismiss for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), "shall be treated as one for summary judgment" if "matters outside the pleading are presented to and not excluded by the court," *id.* 12(b). Whether or not the motion to dismiss has been converted to a motion for summary judgment is not a topic for debate. The court, and not the parties, decides whether the motion to dismiss is converted to one for summary judgment. A decision to exclude matters outside the pleading is tantamount to a decision that the motion will not be converted; a decision not to exclude such extraneous matters triggers the procedures of rule 56 of the Federal Rules of Civil Procedure.[2] Once a court decides to rely on matters outside the pleadings, it may not "exclude from consideration other evidence that had been submitted or might properly be submitted under Rule 56." *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir.1985); *accord Baptiste v. Sennet & Krumholz*, 788 F.2d 910, 911 (2d Cir.1986) (before converting to motion for summary judgment, district court was obligated to give plaintiff notice of intention to convert and opportunity to respond with appropriate evidence).

■ The decision whether or not to convert the motion is within the court's discre-

---

moved to dismiss, Morris sought leave to amend his complaint. That motion was contested by defendants' former attorneys, but after their current attorneys entered the case, they accepted service of the amended complaint and pressed their motion against it. According to Morris, the only differences between the original complaint and the amended complaint are that the latter corrects some typographical errors and adds a claim under the Racketeer In-

fluenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968.

**2.** If the court does not exclude matters outside the pleading, "the motion shall be treated as one for summary judgment and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b); *cf. id.* 12(c) (conversion of motion for judgment on pleadings to motion for summary judgment).

**1494**

tion. *See Ware v. Associated Milk Producers, Inc.,* 614 F.2d 413, 415 (5th Cir. 1980) (per curiam). "When the extra-pleading material is comprehensive and will enable a rational determination of a summary judgment motion, the court is likely to accept it; when it is scanty, incomplete or inconclusive, the court probably will reject it." 5 C. Wright & A. Miller, Federal Practice and Procedure § 1366, at 679 (1969). Given the complexity of Morris's amended complaint and the variety of legal attacks on it mounted by the defendants, the key issue for the court is whether or not each of the thirty claims is legally cognizable. Additionally, the extraneous material submitted by the defendants is insufficient to dispose of the entire complaint. The court believes that judicial economy would be served by an initial determination on the sufficiency of the complaint, with defendants free to move for summary judgment at a later date. As such, the court will not consider matters outside the complaint, and the defendants' motion to dismiss will not be converted to one for summary judgment.

### III. *Claims Predicated on Gilbert's Misrepresentation of His Status*

Morris's amended complaint alleges that Gilbert represented himself to be a registered representative of Reich, when, in fact, he did not become a registered representative until approximately August 1983. Morris claims that he relied on this misrepresentation to his detriment because he opened an account at Reich; permitted Gilbert to purchase, sell, and retain securities in the account on a discretionary basis; assented to Gilbert's recommendations regarding the purchase, sale, and retention of securities; and authorized purchases and sales upon such recommendations. According to Morris, he did not learn of Gilbert's misrepresentation until about February 1985.

The complaint alleges claims against both Gilbert and Reich individually, as well as a conspiracy claim against both, arising out of this misrepresentation. Thus, Gilbert is alleged to have violated section 10(b) of the Securities Exchange Act of 1934, 15

U.S.C. § 78j(b), and rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5 (claim 1); section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (claim 5); New York General Business Law § 349 (claim 6); and to have committed a common law fraud (claim 7). Reich is also charged with violating General Business Law § 349 (claim 17). In addition, Morris charges Reich with aiding and abetting Gilbert's fraud (claim 12); with violating, as a "controlling person," section 15 of the 1933 Act, 15 U.S.C. § 77o, and section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a) (claim 13); and with liability under principles of respondeat superior (claim 14) and principal and agent (claim 15). The defendants are charged jointly with a conspiracy to defraud Morris (claim 16).

#### A. *Pleading with Particularity*

The defendants contend that all the allegations dealing with a misrepresentation of Gilbert's status fail the particularity requirements of rule 9(b) of the Federal Rules of Civil Procedure. The rule provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Specifically, the defendants argue that the complaint misses the mark in failing to identify (1) which securities were traded as a result of Gilbert's misrepresentation and (2) the agency relationship between Reich and Gilbert.

On the first point, Morris persuasively quotes the following language from an opinion of our court of appeals:

> There is therefore no reason to analyze Rolf's portfolio on a stock by stock basis to determine which purchases and sales constituted frauds upon Rolf, a more specific and particularized investigation which we might have to undertake if Yamada had merely manipulated two or three stocks without engaging in a more exhaustive and all-encompassing web of fraud.

*Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct 642, 58 L.Ed.2d 698 (1978). As in *Rolf,* Morris does not allege that any particular securities transaction, or even any series of transactions, constituted a fraud. Instead, he alleges that every transaction in his Reich account was the product of a fraud perpetrated by Gilbert and aided by Reich. In other words, Morris would not have opened an account with Reich, let alone act on Gilbert's recommendations, had he known the truth about Gilbert's status. Without reaching the question of how damages may be computed for the Gilbert misrepresentation, the court is satisfied that Morris is sufficiently specific in alleging that all his trades with Reich stemmed from Gilbert's false representation that he was a registered representative.

■ With regard to the defendants' contention that Morris has failed to specify the agency relationship between Reich and Gilbert, the court finds sufficient the allegation that Gilbert was Reich's agent for the transactions complained of. The details of Gilbert's relationship with Reich surely are better known to the defendants than to Morris, who may learn more about the relationship in discovery. In any event, the allegation that Gilbert was Reich's agent is sufficient for purposes of describing "the circumstances constituting fraud" under rule 9(b). While Morris could not satisfy the pleading requirement of rule 9(b) with "conclusory allegations that defendant's conduct was fraudulent or deceptive," *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982), with respect to the charge that Gilbert misrepresented his status "[t]here can be no doubt that the [c]omplaint gives each defendant notice of precisely what he is charged with," *Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir.1985).

## B. *Stating a Claim*

■ Aside from the contention that the complaint fails to particularize fraud, the defendants argue that the allegations regarding a misrepresentation of Gilbert's status fail to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6). In this connection, Gilbert and Reich challenge Morris's reading of *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), and place their reliance on *Hayden v. Walston & Co.*, 528 F.2d 901 (9th Cir.1975) (per curiam).

In *Marbury Management,* defendant Kohn was employed by the brokerage house of Wood, Walker & Co. as a trainee. Although Kohn was employed as a trainee, he misled plaintiffs with "repeated statements that he was a stock broker" and used "a business card stating that he was a 'portfolio management specialist.'" 629 F.2d at 707. The district court held Kohn liable under section 10(b), inferentially finding that his misstatements induced both the purchase and the retention of certain securities. *Id.* The district court also dismissed plaintiffs' claims against Wood, Walker, finding that the brokerage house was guilty, at most, of negligently supervising Kohn. *Id.* The court of appeals affirmed the judgment against Kohn and ordered a new trial as against Wood, Walker. The Second Circuit held that plaintiffs' allegation of detrimental reliance on Kohn's misrepresentation of his status stated a claim under section 10(b) and rule 10b–5. *Id.* at 710. Moreover, the court distinguished the case upon which Gilbert and Reich now rely—*Hayden v. Walston & Co.*, 528 F.2d 901 (9th Cir.1975) (per curiam): "there the plaintiffs had purchased securities through a salesman who was not a duly licensed registered representative, but did not show that the salesman's nondisclosure of his status rendered his other statements misleading within the meaning of Rule 10b–5, and there was, evidently, no claim or proof that he held himself out to be a duly registered representative." 629 F.2d at 710.

Defendants are not unaware of *Marbury Management*'s distinction of *Hayden*. Instead, they argue that Morris's complaint is deficient under *Hayden*, as ratified by *Marbury Management*. Toward this end, defendants maintain that Morris is unable to plead proximate cause, i.e., a relation-

ship between misrepresentations by Gilbert and damage to Morris. As authority for this proposition, defendants quote at length from *Marbury Management*, or, to be more specific, from Judge Meskill's dissenting opinion in that case. But the majority in *Marbury Management* held that misrepresentations that lead to the purchase and retention of securities may be the proximate cause of damages, *see* 629 F.2d at 710 n. 3, and this court is bound by that determination. Therefore, the allegation that misrepresentations by Gilbert led Morris to buy and retain securities states a claim under section 10(b) and rule 10b–5.

### IV. Consumer Protection Claims

■ In 1980, New York amended its consumer protection statute to add a private right of action for injuries resulting from consumer and business fraud. N.Y.Gen. Bus.Law § 349(h) (McKinney Supp.1986); *see generally* Note, *New York Creates a Private Right of Action to Combat Consumer Fraud: Caveat Venditor,* 48 Brooklyn L.Rev. 509 (1982). Section 349(a) provides: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." The private right of action is conferred by section 349(h):

> In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant wilfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

Morris pleads four claims under section 349 of the General Business Law: the sixth claim, which charges Gilbert with misrepresenting his status as a registered representative; the tenth claim, which charges Gilbert and Reich with misrepresentations concerning stock splits; the seventeenth claim, which charges Reich with misrepresenting Gilbert's status as a registered representative; and the twenty-fourth claim, which charges Gilbert and Reich with misrepresentation concerning discretionary trading. The defendants argue that section 349 was not intended to reach the types of conduct alleged in the complaint.

In *Genesco Entertainment, a Division of Lymutt Industries v. Koch,* 593 F.Supp. 743 (S.D.N.Y.1984), Judge Weinfeld noted that:

> Section 349 is a powerful remedy for consumer fraud. Its broad language was intended to provide a "strong deterrent against deceptive business practices" and to "increase the effectiveness of the consumer protection laws." In keeping with these deterrent purposes, section 349 has been construed to allow recovery even in the absence of a showing of intent to deceive. Allegations of fraud are not required.

*Id.* at 751 (footnotes omitted).

*Genesco* stemmed from the cancellation of a country and western music concert that the plaintiff sought to promote in Shea Stadium. *Id.* at 745. The court granted defendants summary judgment on the section 349 claims for two reasons. First, plaintiff had not shown that the misrepresentations it alleged constituted a "deceptive practice" under the statute. *Id.* at 751. Second, the court was loath to construe the statute in a way that "would alter completely the legal duties governing commercial relationships in New York." *Id.* Judge Weinfeld amplified the second reason:

> The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising. The consumer oriented nature of the statute is evidenced by the remedies it provides. Section 349(h) provides parties with the opportunity to re-

ceive the greater of actual damages or $50. The New York cases where plaintiffs have recovered under section 349(h) further reflect its consumer orientation since they uniformly involve transactions where the amount in controversy is small. That the deceptive practices this statute seeks to combat involve recurring transactions of a consumer type is further supported by the origins of the statute. Section 349(h) is substantially modelled on the Federal Trade Commission Act [15 U.S.C. § 45].

*Id.* at 751–52 (footnotes omitted).

The court found that the rental of Shea Stadium was not an ordinary or recurring consumer transaction, but a sui generis transaction "involving complex arrangements, knowledgeable and experienced parties and large sums of money." *Id.* at 752. Moreover, the plaintiff and the defendants were the only parties affected by the alleged misrepresentations. *Id.* Finally, if section 349 were read to cover the transaction before the court, "the essential requirements for fraud in commercial dealings would effectively be nullified." *Id.* (footnote omitted).

*Genesco* is not on all fours with this action, because the rental of Shea Stadium was truly a "one-shot deal" involving sophisticated businesspersons. The transaction involved in *Genesco* clearly had nothing to do with the standard scenario contemplated by consumer protection statutes. Sales of securities are not so obviously outside the scope of section 349, because sales do recur and the buyer is often far less sophisticated than the seller. *Cf. People by Abrams v. British & American Casualty Co.,* 133 Misc.2d 352, 359, 505 N.Y.S.2d 759, 765 (Sup.Ct.N.Y.Co.1986) (deceptive letters by insurance company to dentists are "dishonest and misleading" within meaning of section 349 and may be enjoined); *Goldberg v. Manhattan Ford Lincoln-Mercury, Inc.,* 129 Misc.2d 123, 125–26, 492 N.Y.S.2d 318, 321 (Sup.Ct.N.Y. Co.1986) (deceptive trade practices include false advertising; pyramid schemes; deceptive preticketing; misrepresentation of the origin, nature, or quality of the product; false testimonial; deceptive collection ef-

forts against debtors; deceptive practices of insurance companies; and "bait and switch" operations); *see generally Vitabiotics, Ltd. v. Krupka,* 606 F.Supp. 779, 785 (E.D.N.Y.1984) (granting summary judgment to plaintiff, under section 349(h), on claim that vitamin manufacturer's former distributor misrepresented identity of product's developer).

On the other hand, people do not generally buy securities in the same way that they buy an automobile, a television set, or the myriad consumer goods found in supermarkets. For one thing, securities are purchased as investments, not as goods to be "consumed" or "used." Additionally, the securities markets are subject to pervasive federal regulation, and it is questionable that New York's legislature intended to give securities investors an added measure of protection beyond that provided by the securities acts and, indeed, by RICO. Thus, although the sale of securities seems to the court closer to a consumer transaction than does the rental of Shea Stadium, the court nevertheless holds that the allegations of the sixth, tenth, seventeenth, and twenty-fourth claims fail to state claims for relief under section 349. These counts, therefore, are dismissed.

### V. *Stock Split Claims*

Nine of Morris's claims (2, 9, 10, 11, 18, 19, 20, 21 and 22) rest on the theory that he was damaged by his detrimental reliance on representations by Gilbert that the stocks of Telesphere International Inc. and Biotech Research Labs Inc. would split. Defendants argue that a stock split is a zero-sum transaction to each holder of the split security, so the failure of a stock to split cannot result in damages to the shareholder. Arithmetically speaking, defendants' contention makes a good deal of sense. The real world of securities markets is not necessarily governed by principles of arithmetic, however. Morris is at least entitled to attempt to prove that his reliance on a false projection of a stock split caused him damages, since it is entirely possible that two shares of stock priced at x will rise in value faster than one share

priced at 2x. This can be true, even though each holding represents an equivalent percentage of a corporation's equity, because of the psychology of markets. *See* Note, *Rule 10b–5 Damage Computation: Application of Financial Theory to Determine Net Economic Loss,* 51 Fordham L.Rev. 838, 855 n. 76, 858 n. 96 (1983). Accordingly, defendants' motion to dismiss the nine claims predicated on the nonoccurrence of splits in the stock of Telesphere and Biotech is denied, except insofar as some of the claims are dismissed on other grounds discussed elsewhere in this opinion.

### VI. *Violations of Stock Exchange Rules*

■ Morris's complaint makes repeated references to the rules of the National Association of Securities Dealers (NASD) and the American Stock Exchange (Amex), which, he alleges, were violated by Gilbert and Reich. The defendants contend that these references are immaterial and should be stricken. Fed.R.Civ.P. 12(f) ("the court may order stricken from any pleading ... any redundant, immaterial, impertinent, or scandalous matter").

Morris does not contest the defendants' assertion that violations of NASD and Amex rules do not give rise to a private right of action. Instead, he maintains that the trier of fact may consider violations of these rules in determining whether the defendants committed fraud.

"[B]ecause motions to strike on these grounds are not favored, often being considered 'time wasters,' they usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." 5 C. Wright & A. Miller, Federal Practice and Procedure § 1382, at 807–10 (1969) (footnotes omitted); *accord Abdulrahim v. Gene B. Glick Co.,* 612 F.Supp. 256, 260 n. 1 (N.D.Ind.1985); *Mitchell v. Hart,* 41 F.R.D. 138, 143 (S.D.N.Y.1966). With one exception, the court cannot say that the allegations of NASD and Amex rule violations have no possible relation to the controversy. The exception is paragraph 8 of the complaint, where the rules are invoked,

along with various federal and state statutes and principles of common law, as authorities under which the action arises. Clearly, the action cannot be said to arise under NASD and Amex rules. Thus, the motion to strike will be granted to the extent that reference to the rules will be excised from paragraph 8 of the complaint; in all other respects, the motion to strike is denied.

### VII. *Liability Under Section 17(a) of the 1933 Act*

Morris's fifth, ninth, and twenty-third claims rely upon section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). That statute, in short, makes it "a violation to engage in any scheme to defraud in connection with the sale of a security." *Mosher v. Kane,* 784 F.2d 1385, 1390 (9th Cir.1986). Gilbert and Reich move for dismissal of the claims predicated on section 17(a) because they say that statute does not confer a private right of action.

Whether a statute confers a private right of action *vel non* is to be determined under the four-part test of *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), as explicated by *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). *See Landry v. All American Assurance Co.,* 688 F.2d 381, 388 (5th Cir.1982). The answer to this question with respect to section 17(a) has been sufficiently elusive that the Supreme Court has reserved decision on three occasions. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 378 n. 2, 103 S.Ct. 683, 685 n. 2, 74 L.Ed.2d 548 (1983); *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 557 n. 9, 99 S.Ct. 790, 795 n. 9, 58 L.Ed.2d 808 (1979); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 733 n. 6, 95 S.Ct. 1917, 1924 n. 6, 44 L.Ed.2d 539 (1975). The circuits have split, with some holding there is a private right of action, *see, e.g., Mosher, supra,* 784 F.2d at 1390–91 n. 9; *Newman v. Prior,* 518 F.2d 97 (4th Cir.1975), and others holding that there is not, *see, e.g., Keys v. Wolfe,* 709 F.2d 413, 416 (5th Cir.1983); *Landry, supra,* 688 F.2d at 387. While the Second

Circuit once held that section 17(a) confers a private right of action, *Kirshner v. United States*, 603 F.2d 234, 241 (2d Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), subsequent Supreme Court decisions refusing to answer the question may leave that holding "open to reexamination," *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 559 n. 3 (2d Cir.1985). *Yoder* declined to take a position, *id.*, as did *Zerman v. Ball*, 735 F.2d 15, 23 (2d Cir.1984).

It is unnecessary for this court to enter the thicket at this time, for the same reasons that the Second Circuit expressed in *Zerman.* If Morris prevails on his rule 10b–5 claims, a remedy under section 17(a) will be unnecessary to his recovery; if he does not prevail on his rule 10b–5 claims, it is unlikely that he would prevail on similar section 17(a) theories. *See id.* Thus, defendants' motion to dismiss plaintiff's claims under section 17(a) is denied, without prejudice to renewal of the motion in the event that the Supreme Court or the Second Circuit decides in the interim that the statute does not give rise to a private right of action.

### VIII. *Aiding and Abetting*

■■■ In three claims, Morris alleges that Reich aided and abetted Gilbert's misrepresentations. Specifically, the twelfth claim charges Reich with aiding and abetting Gilbert's misrepresentation of his status as a registered representative; the eighteenth claim charges Reich with aiding and abetting Gilbert's misrepresentation concerning stock splits; and the twenty-fifth claim charges Reich with aiding and abetting Gilbert's misrepresentation concerning discretionary trading in Morris's account. In support of its argument that these three claims have not been pleaded adequately, Reich correctly lists the following as the elements of an aiding and abetting claim under section 10(b) of the Securities and Exchange Act of 1934: (1) plaintiff must show that the primary party, Gilbert, committed a securities law violation; (2) plaintiff must show that the aiding and abetting party, Reich, knew of Gilbert's fraud; and (3) plaintiff must show that the aiding and abetting party rendered substantial assistance to the primary party. *See Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47–48 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *accord, e.g., Caleb & Co. v. E.I. DuPont de Nemours & Co.*, 599 F.Supp. 1468, 1475 (S.D.N.Y.1984). Although the details of these three elements are not pleaded at length in the body of the three claims in question, each of those claims incorporates by reference sufficient portions of the complaint to put Reich on notice of why it is charged with liability as an aider and abettor and to satisfy the *Rolf* test. Gilbert's motion to dismiss the twelfth, eighteenth, and twenty-fifth claims is denied.

### IX. *Respondeat Superior and Agency*

■■■ Morris's complaint charges Reich with liability under the theories of respondeat superior and principal and agent in six claims: the fourteenth, fifteenth, twentieth, twenty-first, twenty-seventh, and twenty-eighth. As the numbering of the claims indicates, there are three sets of two. In other words, with respect to each of his three major allegations of misrepresentations—concerning registered representative status, stock splits, and discretionary trading—Morris charges that Reich is liable for Gilbert's wrongdoing under respondeat superior and agency theories. Reich argues that Morris has failed to plead facts showing a principal-agent relationship between Reich and Gilbert, and further contends that the claims are duplicative, because the theories of respondeat superior and of agency are identical.

The court rejects defendants' first challenge to these six claims. Given their incorporation by reference of other allegations in the complaint, these claims adequately plead the principal-agent relationship. But defendants' second challenge is well taken. Under New York law, which the parties do not dispute applies to the state law claims in the complaint, "there is no distinction to be drawn between the liability of a principal for the tortious act of his agent and the liability of a master for

the tortious act of his servant," because, in both circumstances, "the liability is grounded upon the maxim of respondeat superior," 3 N.Y.Jur.2d, Agency and Independent Contractors § 253, at 75 (1980). "An agent may be one for whose physical act the employer is responsible and who is called an independent contractor in order to distinguish him from a servant, also an agent, for whose physical act the employer is responsible." *Spica v. Connor*, 56 Misc.2d 364, 366, 288 N.Y.S.2d 719, 723 (Dist.Ct. Suffolk Co.1968) (quoting Restatement (Second) of Agency § 1 comment e (1958)).

The short of the matter is that, having pleaded respondeat superior claims, Morris gains nothing by pleading claims under the theory of principal and agent. Although the court permitted claims under section 17(a) to stand, notwithstanding the potential duplication of claims under rule 10b–5, *see* part VII, *supra*, the situation is different here. It is at least arguably possible that section 17(a) claims will provide an avenue of relief unavailable under rule 10b–5. The court cannot discern any set of circumstances under which principal and agent claims will garner for Morris relief he could not obtain under respondeat superior. Therefore, the principal and agent claims—the fifteenth, twenty-first, and twenty-eighth claims in the complaint, are dismissed.

## X. RICO

The amended complaint adds a thirtieth claim, under which Morris seeks from the defendants treble damages, costs, and attorneys' fees, pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. According to Morris, he is entitled to damages under RICO, *see* 18 U.S.C. § 1964(c), because the defendants conspired, *see id.* § 1962(d), to violate the statute. Subsection (d) of section 1962 makes it unlawful to conspire to violate subsection (a), (b), or (c). Although the complaint does not specify which subsection the defendants conspired to violate, it is apparent that Morris charges a conspiracy to violate subsection (c), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Plaintiff's reliance on section 1962(c) is apparent because the amended complaint alleges, *inter alia*, that "Reich as a corporation engaged in the brokerage business, and Gilbert, who was associated with such business, were engaged in an enterprise within the meaning of RICO," Amended Complaint para. 139, and that "Reich and Gilbert had a common scheme, plan or motive to defraud Morris, and participated in the conduct of Reich's affairs, through a pattern of racketeering activity in the sale of securities," *id.* para. 140.

The defendants concentrate their attack on the RICO claim on three fronts: (1) Morris has failed to allege the requisite two predicate acts, *see* 18 U.S.C. § 1961(5), because none of the alleged acts is indictable, *see id.* § 1961(1)(B); (2) Morris has failed to allege a "pattern of racketeering activity," *see id.* § 1961(5); and (3) Morris is not permitted to name Reich as "simultaneously the 'enterprise' and the 'person' who conduct[ed] the affairs of the enterprise through a pattern of racketeering activity," *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 315 (2d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).

"A violation of [section] 1962(c) ... requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted). Prior to *Sedima*, the "checklist," *Rush v. Oppenheimer & Co.*, 628 F.Supp. 1188, 1192 (S.D.N.Y. 1985), was stated somewhat more expansively by the Second Circuit, which was not limiting its discussion to section 1962(c). The court wrote:

To state a claim for damages under RICO a plaintiff has two pleading burdens. First, he must allege that the de-

fendant has violated the substantive RICO statute, 18 U.S.C. § 1962 (1976), commonly known as "criminal RICO." In so doing, he must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a)–(c) (1976). *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).[3]

 Against this background, the court finds the defendants' first attack on the RICO claim meritless. That is to say, there is really no question that Morris has alleged, at a minimum, a large number of acts that would constitute mail fraud, 18 U.S.C. § 1341, or wire fraud, *id.* § 1343. To be sure, it does not require much to come within the broad sweep of the mail and wire fraud statutes, but Congress included violation of these acts in its definition of "racketeering activity," *id.* § 1961(1)(B). The other two attacks on the RICO claim are more substantial.

### A. *Enterprise/Person Distinction*

 Reich argues that it cannot be at the same time a "person" that conducted the affairs of an "enterprise" through a pattern of racketeering activity and the "enterprise" in question. Paragraph 140 of the amended complaint alleges that "Reich and Gilbert had a common scheme, plan or motive to defraud Morris, and participated *in the conduct of Reich's affairs*, through a pattern of racketeering activity ..." (emphasis added). Thus, Morris theorizes that Reich was the enterprise whose affairs became infected with a pattern of racketeering activity.

While the courts of this circuit were once split on the question whether the "enter-

prise" and the "person" could be identical, *see United States v. Standard Drywall Corp.*, 617 F.Supp. 1283, 1293–94 (E.D.N.Y. 1985) (collecting cases), the issue has been decided by *Bennett v. United States Trust Co.*, 770 F.2d 308 (2d Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). *Bennett* followed the "majority view" and held "that under section 1962(c) a corporate entity may not be simultaneously the 'enterprise' and the 'person' who conducts the affairs of the enterprise through a pattern of racketeering activity." *Id.* at 315; *accord, e.g., Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 29–30 (1st Cir.1986). In view of *Bennett*'s clear holding, plaintiff's attempts to distinguish the case are unavailing. *Cf. Rush v. Oppenheimer & Co., supra,* 628 F.Supp. at 1193–96 (brokerage firm could not be named RICO defendant under section 1962(c) where plaintiff alleged series of frauds by broker employed by the firm). Accordingly, the RICO claim must be dismissed as against Reich.

### B. *Pattern of Racketeering Activity*

This leaves the question whether Morris has pleaded a cognizable RICO claim against Gilbert, which turns on the question whether a "pattern of racketeering activity" has been alleged. In enumerating prohibited activities, RICO proscribes conducting the affairs of an enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). For RICO purposes, " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." *Id.* § 1961(5).

This elusive phrase—"pattern of racketeering activity"—is one in which the statutory language is only the starting point of analysis. *See generally Kelly v. Robin-*

---

**3.** *Moss*'s parsing of the statute continues to be cited in this circuit in the wake of *Sedima. See, e.g., Von Bulow by Auersperg v. Von Bulow*, 634 F.Supp. 1284, 1304 (S.D.N.Y.1986); *Utz v. Cor-*

*rea*, 631 F.Supp. 592, 594 (S.D.N.Y.1986); *Rush v. Oppenheimer & Co.*, 628 F.Supp. 1188, 1192 (S.D.N.Y.1985).

*son*, —— U.S. ——, 107 S.Ct. 353, 358, 93 L.Ed.2d 216 (1986) (interpreting sections 101 and 523 of the Bankruptcy Code). Since the July 1, 1985 decision in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), courts have struggled to interpret the phrase in light of crucial dicta in a footnote to the Court's opinion. Fastening on section 1961(5)'s statement that a pattern "requires" at least two racketeering acts, the footnote inferred "that while two acts are necessary, they may not be sufficient." 105 S.Ct. at 3285 n. 14. The Court read the legislative history of RICO to mean that "two isolated acts of racketeering activity do not constitute a pattern." *Id.* Emphasizing language in a Senate report on the bill, *Sedima* noted that a pattern required "continuity plus relationship." *Id.* (quoting S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)). The Court also suggested consideration of the definition of "pattern" appearing in 18 U.S.C. § 3575(e): "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 105 S.Ct. at 3275 n. 14.

Interpretation of this footnote is now a cottage industry. "Pattern" is defined "restrictively," *Malley-Duff & Associates v. Crown Life Insurance Co.*, 792 F.2d 341, 353 n. 20 (3d Cir.1986), in cases such as *Superior Oil Co. v. Fulmer*, 785 F.2d 252, 257 (8th Cir.1986) (no pattern where defendants' actions were one continuing scheme to convert gas from plaintiff's pipeline and there was no proof that defendants had done this before or engaged in other criminal activities), and *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828, 831 (N.D.Ill.1985) ("pattern" connote similarity and multiplicity of events; RICO requires "repeated criminal

*activity*, not merely repeated *acts* to carry out the *same* criminal activity") (emphasis in original). "Pattern" is defined more expansively in *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1355 (5th Cir.1985) (Wisdom, J.) (two mailings—an invoice and a subsequent attorney's letter enclosing a copy of the invoice and demanding payment—were sufficiently related to constitute pattern),[4] and *Conan Properties, Inc. v. Mattel, Inc.*, 619 F.Supp. 1167, 1170 (S.D. N.Y.1985) (two acts relating to each other and arising out of the same scheme satisfy pattern requirement). Although *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc., supra*, has been followed by some district courts in this circuit, *see, e.g., Richter v. Sudman*, 634 F.Supp. 234, 239 (S.D.N.Y. 1986); *Soper v. Simmons International, Ltd.*, 632 F.Supp. 244, 251–54 (S.D.N.Y. 1986), it has been repudiated in its home circuit by *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir.1986). The *Morgan* court noted that *Inryco* and its progeny refused to find a pattern "when the predicate acts were all implemented in furtherance of the same criminal scheme," 804 F.2d at 974, while other courts refused to view the pattern requirement more restrictively in light of *Sedima*'s footnote 14, 804 F.2d at 975. The Seventh Circuit "agree[d] with those courts that have steered a middle course between these two extremes," *id.* at 975, holding that "[i]n order to be sufficiently continuous to constitute a pattern of racketeering activity, the predicate acts must be ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions, i.e., 'transactions "somewhat separated in time and place,"'" *id.* at 975 (quoting *Graham v. Slaughter*, 624 F.Supp. 222, 225 (N.D.Ill.1985)). The court added:

> Relevant factors include the number and variety of predicate acts and the length of time over which they were committed,

---

4. *R.A.G.S.* was criticized with incredulity by the author of *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc., supra*, in *Papagiannis v. Pontikis*, 108 F.R.D. 177, 179 n. 3 (N.D.Ill.1985) (Shadur, J.). Moreover, a subsequent Fifth Circuit case discussed, without deciding, what was needed to prove a pattern of racketeering activity without referring to *R.A.G.S.* at all. *See Smoky Greenhaw Cotton Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 785 F.2d 1274, 1280–81 n. 7 (5th Cir.1986).

the number of victims, the presence of separate schemes and the occurrence of distinct injuries. However, the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement. The doctrinal requirement of a pattern of racketeering activity is a standard, not a rule, and as such its determination depends on the facts and circumstances of the particular case, with no one factor being necessarily determinative.

*Id.* at 975.

■ The conflict among the cases supports the observation: "it has become clear that something more than merely two prior acts is required. The question remains how much more." *United States v. Friedman,* 635 F.Supp. 782, 784, *modified on other grounds,* 636 F.Supp. 462 (S.D.N.Y. 1986). The answer to the question will usually depend on the unique facts of each case. Courts will decline to find a pattern where the various acts were no more than parts of a single activity. *See, e.g., Vereins-Und Westbank AG v. Carter,* 639 F.Supp. 620, 624–25 (S.D.N.Y.1986) (no pattern where fraudulently obtained loans were all part of a "package"); *Richter v. Sudman,* 634 F.Supp. 234, 240 (S.D.N.Y. 1986) (no pattern where each fraud served the common end of raising money for ice cream manufacturer); *Frankart Distributors, Inc. v. RMR Advertising, Inc.,* 632 F.Supp. 1198, 1201 (S.D.N.Y.1986) (no pattern where all mailings were part of a single transaction dealing with a single contract to be performed in limited period of time); *Soper v. Simmons International, Ltd.,* 632 F.Supp. 244, 254 (S.D.N.Y. 1986) (no pattern where all predicate acts were merely ministerial acts performed in execution of single scheme to deprive plaintiffs of promised commission); *Anisfield v. Cantor Fitzgerald & Co.,* 631 F.Supp. 1461, 1467 (S.D.N.Y.1986) (numerous misrepresentations in connection with single offering of limited partnership interests do not create a pattern); *Utz v. Correa,* 631 F.Supp. 592, 595 (S.D.N.Y.1986) (no pattern where every action by defendants was in furtherance of isolated fraudulent episode); *Professional Assets Management, Inc. v. Penn Square Bank, N.A.,* 616 F.Supp. 1418, 1421–22 (W.D.Okla.1985) (no pattern where many actions went into preparation of audit report, which constituted a "single, unified transaction"). And, of course, there is no pattern when the alleged racketeering acts are unrelated. *See, e.g., Rojas v. First National Bank Association,* 613 F.Supp. 968, 971 n. 1 (E.D.N.Y.1985).

■ Here, Morris has alleged three large schemes by Gilbert: (1) inducement to trade securities on the misrepresentation that Gilbert was a registered representative of Reich; (2) misrepresentations about expected splits in the stock of Telesphere and Biotech; and (3) unauthorized discretionary trading. These allegations, sprinkled throughout the complaint, are incorporated in the RICO claim. Additionally, the RICO claim lists a series of other predicate acts not mentioned previously in the complaint.

The court finds that these allegations suffice to state a RICO claim against Gilbert. The allegations were somewhat similar in *Rush v. Oppenheimer & Co., supra,* where plaintiff charged that a brokerage employee engaged in churning (excessive trading) and knowingly made unsuitable recommendations regarding stock purchases. *See Rush,* 628 F.Supp. at 1189. The court noted that a RICO plaintiff, to satisfy the pattern requirement, must show both a "relationship" and "continuity," *id.* at 1199, and concluded that Rush had met his pleading obligations by charging predicate acts that took place over a period of eighteen months, where there was sufficient continuity to show more than one criminal act divided into pieces and a sufficient relationship among the acts to show that the broker sought to defraud the investor out of his stock equity, *id.* at 1200. This is the central dilemma in the developing case law defining "pattern of racketeering activity." While courts may wish to stem the floodtide of civil RICO cases, *see Sedima, supra,* 105 S.Ct. at 3277 n. 1, they are not free to eviscerate the statute passed by

Congress. An unduly restrictive reading of "pattern" would have that effect, because a court could find that any closely related series of events amounted to no more than one scheme (and thus did not constitute a pattern) while any series of events not so closely related amounted to no more than a disjointed set of isolated events (and thus did not constitute a pattern). *See Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986) (excessive focus on continuity would lead to untenable result that defendants who commit large and ongoing single scheme would automatically escape RICO liability). In *Rush, supra,* the court found a proper allegation of a pattern between these two extremes, and this court finds that Morris also fits between the extremes. He has alleged a variety of criminal acts, over a significant period of time, committed in furtherance of three discrete—but related—schemes to separate him from his money. Regardless of how *Sedima* 's footnote 14 ultimately is understood, Morris's complaint suffices to allege a pattern of racketeering activity. Therefore, Gilbert's motion to dismiss the RICO claim is denied.

XI. *Miscellaneous Other Matters*

The court finds that Morris had adequately pleaded conspiracy and common law fraud claims. Extended discussion of defendants' attacks on these claims is not necessary.

In view of the court's finding that many of plaintiff's federal claims were adequately pleaded, the court does not reach defendants' contention that pendent state claims should be dismissed for want of a federal foundation. Finally, inasmuch as the court has declined to convert the pending motion to one for summary judgment, it will not at this time consider defendants' contention that plaintiff's claims are barred by a purported indemnity agreement.

The court has considered all of defendants' other arguments and, to the extent they are not discussed in this opinion, they are nevertheless found to lack merit. Counsel are to appear in courtroom 5 on January 20th, 1987 at 4:30 p.m., for a status conference.

SO ORDERED.

The CITY OF NEW YORK, Plaintiff,

v.

RAPGAL ASSOCIATES, the St. Nicholas Manor Associates, and Norman Rappaport Defendants.

No. 84 Civ. 7526 (JMW).

United States District Court,
S.D. New York.

Dec. 23, 1986.

New York City Law Dept. by Alexandra S. Bowie, Michael D. Young, for plaintiff.

Gilbert Wallach by Steven Rosen, New York City, for defendants.

WALKER, District Judge:

## INTRODUCTION

The City of New York commenced this action to compel defendants Rapgal Associates, The St. Nicholas Manor Associates and Norman Rappaport to donate $156,211 to a community organization. The defendants are real estate developers who participated in the federally funded and locally administered Neighborhood Strategy Area program ("NSA program") for the Hamilton Heights area of Manhattan. Six months after the defendants entered the NSA program, the City promulgated a regulation requiring participating developers to contribute a specified portion of their profits to a local community organization. The defendants have refused to obey the regulation claiming that it does not apply to them. The City, in turn, has denied defendants the opportunity to participate in further local housing development projects. The defendants have counterclaimed against the City, alleging that this denial violates the defendants' rights as a matter of tort, contract, and constitutional law.

The City has moved for summary judgment on its claims, pursuant to Fed.R. Civ.P. 56, and to dismiss defendants' coun-

terclaim under Fed.R.Civ.P. 12 on the grounds that the defendants, first, have failed to state a claim upon which relief can be granted and, second, did not notify the City of their claim within the time required by local law.

The parties do not dispute the material facts which gave rise to this case, although they hotly contest the legal conclusions to be drawn from the facts. The defendants oppose the motion for summary judgment by arguing that, under their reading of the law, there are additional factual issues which require a trial on the merits.

### FACTS

#### I. *The NSA Program*

The case involves the City's administration of the NSA program, designed by the United States Department of Housing and Urban Development ("HUD") to coordinate local housing and development planning with federal funding for low income housing. Under the program, the local government requests HUD to designate a discrete area a Neighborhood Strategy Area ("NSA"). Once HUD does so, the local government may solicit and screen proposals for Section 8 housing submitted by private developers.[1] The City, thus, has the means to ensure that Section 8 housing projects are consistent with its local development plans and associated codes, regulations and orders. Once the City determines that a project is in accord with its plans and appears to meet the federal Section 8 program requirements, the City forwards the proposal to HUD for approval. After HUD approval is obtained, the developer becomes eligible for a federally subsidized and guaranteed mortgage and local real estate tax abatements.

#### II. *The Events*

In May 1978, the City of New York applied to HUD for NSA designation of the Hamilton Heights section of Manhattan. After a conditional approval of the City's application in September 1978, HUD granted final approval for Hamilton Heights in September 1979. On May 21, 1979, during the interim between conditional and final approval, the City's Department of Housing Preservation and Development ("HPD"), charged with administering the NSA program, published a "Request for Housing Proposals" to solicit plans from prospective Section 8 developers. The published notice specified a requirement that every developer under the NSA program enter an agreement with a local community organization to donate some amount of the profits from the real estate venture to the organization. The notice also stated that both the organization chosen to receive the funds and the form of the agreement were subject to HPD approval.

On May 23, 1979, the defendants submitted an NSA program proposal to develop "St. Nicholas Manor" in the Hamilton Heights area of Manhattan. Before submitting the proposal the defendants reached an agreement to donate $50,000 to the Hudson Piers Redevelopment Counsel, a local community group, should HPD and HUD approve the St. Nicholas Manor project. The defendants submitted to HPD a detailed analysis of their estimated costs for the project, predicated on their donation of $50,000 to the Hudson Piers Redevelopment Council. By letter dated September 12, 1979, HPD approved the defendants' proposal to develop St. Nicholas Manor and enclosed therewith that portion of the previously published "Request for Housing Proposals" referring to donations to community organizations. The letter stated that the defendants must tender an agreement with a qualified community organization to HPD within six weeks of the date of the letter. HUD granted federal approval for the project on September 21, 1979.

On November 28, 1979 the defendants forwarded to HPD a written contract with

---

**1.** Under the Section 8 housing program, established in 42 U.S.C. §§ 1437–1440 and 12 U.S.C. § 1715z–1, the federal government allots rent subsidies to qualified low income families in order to help them procure safe, sanitary, comfortable and affordable homes. The federal government then pays the landlord the excess between 30 percent of the tenant's income and the fair rental value of the apartment.

the Hudson Piers Redevelopment Council that obligated the defendants to pay $50,-000 to the group over a five year period. HPD never formally approved the contract nor conveyed any approval to defendants. However, an internal memorandum, dated April 22, 1980, states that the Hudson Piers Redevelopment Council "appeared" to have an agreement that met the City's standards.

On May 7, 1980, HPD issued a complex set of regulations to implement its goal of returning some portion of the developers' profits back to the community. These regulations detailed the method for computing the minimum amount of money each developer must agree to contribute to a community organization, established guidelines for use of the money by the groups, and explained HPD's role in overseeing the agreements.

By letter dated May 7, 1980, HPD informed each developer of these regulations. The regulations, which the City enclosed with the letter, stated that in order to avoid delaying review and approval of Section 8 housing proposals, HPD would establish escrow accounts for developer contributions if no agreement between a developer and a qualified community organization had been reached or if a signed agreement was subsequently disapproved by the City. With the funds in escrow, the City would allow the project to proceed. The money could be released from escrow pursuant to an acceptable agreement. While the City had the right to refuse to close on the final mortgage if an agreement was not reached it could also, at its option, direct the use of the escrowed funds for certain general community works in the particular NSA. The regulations established percentage guidelines for community organization donations and the letter explained that, "the guidelines for minimum payments to community groups are designed to set a standard below which agreements will not be acceptable. However, any agreement that *exceeds* our minimum guidelines will remain in force."

On July 9, 1980 following inquiries by perplexed developers who were unable to understand the system for computing the minimum payments, HPD amended these regulations. Under the amended regulations, the minimum contribution was an amount equal to at least 2.75 per cent of the low interest mortgage on the project. The letter reiterated that agreements previously approved by HPD for amounts in excess of 2.75 per cent of the developer's mortgage would remain in effect.

The defendants' agreement with Hudson Piers Redevelopment Council for a contribution of $50,000 indisputably did not meet the requirement that developers donate 2.75 per cent of their mortgage. However, after receipt of the May and July letters explaining these regulations, the defendants made no effort to renegotiate their agreement with the Hudson Piers Redevelopment Council or to request that the City approve the agreement as an exception to the regulation.

On December 1, 1980 HPD sent another letter to all developers again setting forth the donation requirements for the NSA program. For the purposes of this summary judgment motion the Court accepts the defendants' claim that they never received this letter and, therefore, at the time knew nothing of its contents.

On July 2, 1981, the initial mortgage closing for the project took place. The City participated in the closing without mentioning the donation requirements or any breach of them by the defendants. During the period between the City's September 12, 1979 approval of defendants' proposal and this closing, defendants expended approximately $60,000 in preparation for the project.

On December 10, 1981, five months after the closing, HPD notified the defendants that they had not complied with the donation regulation and demanded that they reach an agreement for payment of at least $156,211 to a community group, or deposit this sum of money in an HPD-controlled escrow account. Thereupon, for the first time, defendants attempted unsuccessfully to convince HPD to change its position. On January 28, 1982, Norman Rappaport's request that HPD approve the 1979 agree-

ment was refused. The defendants then asked HPD to waive the 2.75 per cent donation requirement as to them. On January 28, 1983 HPD denied this request, insisted that the defendants comply with the regulation by February 15, 1983, and added that a failure to do so would jeopardize future projects that the defendants might wish to perform under a City program. In April 1983, after defendants refused to submit an agreement, the City notified them that they would not be considered for any further development projects until they complied with the regulation. The defendants completed the St. Nicholas Manor project and, on January 26, 1984, participated in the final mortgage closing. To date, the defendants have made no payment to the Hudson Piers Redevelopment Council, to any other community group or into an escrow account.

## STATUS OF THE CASE

The City seeks summary judgment in its favor directing defendants to donate $156,-211 to a community organization approved by the City and dismissing defendants' counter claim. For the reasons set forth, summary judgment in favor of the City is granted.

## SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. Rule 56, summary judgment is appropriate when "there is no genuine issue as to any material fact" and as a matter of law the moving party is entitled to judgment. Recently both the Supreme Court and the Second Circuit Court of Appeals have pronounced that summary judgment is "not a disfavored procedural shortcut," but rather is one mechanism by which the court can resolve disputes speedily, justly and economically. *Celotex Corporation v. Catrett,* — U.S. ——, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). *See also, Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9 (2d Cir.1986). To withstand a motion for summary judgment *material* facts must be in *genuine* dispute. Mere speculation or conclusory assertions in pleadings or affidavits do not raise triable issues of fact.

## DISCUSSION

The defendants attempt to cast their dispute with the City as one in contract. First, they assert that a contract was formed when they responded to the City's May 1979 published notice entitled "Request for Housing Proposals" with their plan to develop the St. Nicholas Manor and the City on September 12, 1979 authorized the project. This "contract" is said by them to contain only the requirements set forth in the published notice that, it is not disputed, set forth no minimum donation requirement. Second, defendants assert that by subjecting them to regulations promulgated on May 7, 1980 and amended on July 9, 1979, the City is depriving them of the expectation of their bargain, namely, no minimum donation without due process.

The Court agrees with the City, however, that the dealings between the parties prior to May 1980 created no contract between them. These dealings were merely those between a developer and the local administrator of a program for dispensing federal housing benefits. There is no evidence of any bargained-for exchange or relinquishment of consideration for benefits received. By approving the defendants' proposal the City entered no contract, but rather certified to HUD that their project furthered the City's development objectives.

A similar situation arose in *American Hospital Association v. Schweiker,* 721 F.2d 170 (7th Cir.1983). There the American Hospital Association ("AHA") sued the United States Department of Health Education and Welfare ("HEW"), claiming that certain regulations, imposing obligations on all hospitals receiving federal aid under Titles VI and XVI of the Public Health Service Act, 42 U.S.C. §§ 291, 300*o* et seq., violated the contractual rights of the hospitals who had entered the program many years before HEW issued the regulations. In rejecting AHA's claim that, by participating in the program, its hospitals had entered into a contractual relationship with the government that could not be altered by "retroactive regulations" the Seventh Circuit Court of Appeals stated:

The relationship between the government and the hospitals here cannot be wholly captured by the term "contract" and the analysis traditionally associated with that term. Rather than a voluntary agreement negotiated between two parties, a grant-in-aid program like that under the Hill-Burton Act is an exercise by the federal government of its authority under the spending power to bring about certain public policy goals. The government acts by inducing a state or private party to cooperate with the federal policy by conditioning receipt of federal aid upon compliance by the recipient with federal statutory and administrative directions.