**Eileen R. YODER, Plaintiff-Appellant,**

v.

**ORTHOMOLECULAR NUTRITION IN-STITUTE, INC., Healthful Living Company, Inc., Dr. David J. Henderson and Norman Rothstein, Defendants-Appellees.**

**No. 483, Docket 84–7686.**

United States Court of Appeals, Second Circuit.

Argued Nov. 28, 1984.

Decided Jan. 7, 1985.

Lisa Kolb Liebert, New York City, for plaintiff-appellant.

Eli Feit, Heller, Horowitz & Feit, P.C., New York City, for defendants-appellees.

Before FRIENDLY, WINTER and PRATT, Circuit Judges.

FRIENDLY, Circuit Judge:

The principal issue on this appeal is whether a complaint alleging that a company knowingly misrepresented its financial condition when it undertook to issue its stock to a person, who, in reliance thereon, became an employee and also transferred certain assets as a part of the transaction, stated a claim under the federal securities laws. We hold that it did.

The complaint in this action in the District Court for the Southern District of New York alleged substantially as follows: Plaintiff, Eileen R. Yoder, is a nationally known specialist in the field of food allergies. In 1981, she established the Healthful Living Company ("Healthful Living"), a sole proprietorship which was registered to do business in Indiana, through which to conduct her professional activities. By 1983, as a result of her work as a consultant, author and lecturer, plaintiff had developed a mailing list with the names of over 2,000 doctors, other health professionals dealing with food allergies and individuals suffering from such allergies. By this time, plaintiff had also acquired certain proprietary information consisting of special recipes, sources of allergy-free ingredients that the plaintiff had tested extensively, special diet plans, programs for the physical and psychological management of multiple food allergies, and information and material required to develop an individual computerized allergy-free diet program. In the summer of 1983, plaintiff began to seek additional funds to expand Healthful Living, and particularly to enable her to implement and promote the computerized individual allergy-free diet program; she also sought to move from Indiana. She met defendant Henderson, president and chief executive officer of defendant Orthomolecular Nutrition Institute, Inc. ("Ortho-Nutrix"), a publicly held Delaware corporation having its principal place of business in New York City. Henderson expressed an interest in having Ortho-Nutrix purchase Healthful Living and employ plaintiff to assist in the development of the computerized diet program. After negotiations in New York with Henderson and defendant

Rothstein, treasurer and a major shareholder of Ortho-Nutrix, an oral agreement was reached whereby Ortho-Nutrix would purchase from plaintiff the assets of Healthful Living, including its name and good will; the copyright and exclusive right to distribute and promote the book "Allergy Free Cooking" and other Healthful Living publications, including a subscription newsletter; allergy-free recipes developed by plaintiff; all materials and proprietary information necessary to develop and promote the computer diet program; and the exclusive right to publish, copyright and market all of plaintiff's writings during the period of her employment by Ortho-Nutrix. As consideration for the sale of Healthful Living, Ortho-Nutrix was to pay Healthful Living's debts, at that time approximately $82,560; to employ plaintiff for three years at a salary of $40,000 per annum plus insurance benefits; to pay 10% royalties on the sale of publications written by plaintiff after payment of the debts; and to issue to the plaintiff up to 30,000 shares of Ortho-Nutrix stock based on profits generated by the development of the computer diet program. Defendants were alleged also to have agreed to provide the necessary funds and support staff required to develop and promote the program. This oral agreement was to be reduced to writing by the defendants before plaintiff's return to New York.

The complaint alleged further that, at the conclusion of the negotiations in New York, Henderson requested a copy of plaintiff's mailing list for use by Ortho-Nutrix, and that she declined to furnish this prior to receipt of a written acknowledgement of the oral agreement. As a result, plaintiff received a two-page memorandum, signed by Henderson for Ortho-Nutrix, which was stated to constitute "a tentative agreement the spirit of which will remain but will be formally structured by our attorneys." This memorandum conformed generally to the allegations recited above except that the issuance of Ortho-Nutrix shares was tied to the company's gross sales rather than to profits generated by development

of the computer diet program. The clause relating to plaintiff's receipt of Ortho-Nutrix stock is set forth in the margin.[1]

The complaint next alleged that in reliance on defendants' representations, plaintiff furnished Ortho-Nutrix with the mailing list and other proprietary information and assets of Healthful Living and, with her two children, came to New York to commence working for Ortho-Nutrix. In late August, 1983, Ortho-Nutrix had the "Healthful Living Company, Inc." incorporated as a wholly-owned subsidiary. However, plaintiff soon discovered that "defendants were without funds to meet their obligations pursuant to the agreement for the purchase of Healthful Living." In particular, insufficient funds were provided with which to fill orders for Healthful Living publications received from plaintiff's former customers or to enable plaintiff to develop the computer-diet program. On October 14, 1983, defendants terminated plaintiff's services.

The complaint alleged as a first cause of action for violation of the antifraud provisions of the Securities Act and the Securities Exchange Act that defendants made fraudulent representations as to the assets, liabilities and earnings of Ortho-Nutrix. The complaint also alleged pendent state law causes of action for fraud, breach of contract and conversion.

Along with her complaint, plaintiff moved for a preliminary injunction restraining defendants from using Healthful Living's name, mailing lists, publications, or proprietary information and other assets. Defendants countered with a motion for an order pursuant to F.R.Civ.P. 12(b)(6) dismissing the complaint for failure to state a claim upon which relief can be granted, or, in the alternative, for an order pursuant to F.R.Civ.P. 56 granting defendants summary judgment. A supporting affidavit submitted by Rothstein alleged that the arrangement with plaintiff was simply an employment agreement and not the purchase of a business, and that plaintiff's employment had been terminated because she had been unproductive. After this, plaintiff's attorney submitted an affidavit in support of the motion for a preliminary injunction to the effect that examination of Ortho-Nutrix' quarterly reports to the SEC for the periods ending November 30, 1982, and May 31, August 1 and November 30, 1983, disclosed that when "the negotiations between Plaintiff and defendants took place, [Ortho-Nutrix] was operating at a significant loss and experiencing major liquidity problems." The reports give this assertion considerable support. As early as November 30, 1982, when the working capital ratio was 1.8, the company reported that

> given the present level of operating expenses and the lack of significant operating revenues to date, management believes that the Company may face a serious liquidity problem during the next year unless significant revenues can be achieved from the orthomolecular practice assistance program, operating expenses can be reduced and additional sources of financing can be found.

The later reports reveal an increasingly deteriorating financial situation. The May 31 report showed a current working capital ratio of 1.3 and a quarterly loss of $142,515; the August 31 report showed a current ratio of 1.2 and a loss for the quarter of $160,145; the November 30, 1983 report showed a working capital ratio of 1:1 and a $145,859 loss for the quarter. In the May 31 report management repeated its observation that "the Company may face a serious liquidity problem during the next year unless significantly greater revenues can be achieved, operating expenditures can be reduced and additional sources of financing can be found." Statements to the same effect may be found in the other reports as

---

**1.** *Incentive:*
"Computer Allergy Program"—Stock options will be based on gross annual production; at $2 million gross sales per year 10,000 shares will be released; at $3 million gross sales per year 10,000 additional shares will be released; at $4 million gross sales per year 10,000 additional shares will be released. (A total of 30,000 shares of stock may be released).

well; indeed, the November 30, 1983 report went so far as to include the observation that "[t]here can be no assurance that the Company will have sufficient working capital to fund its needs during the next year." Plaintiff also submitted an affidavit in support of her motion and in opposition to defendant's motion. This contradicted many of the allegations made in Rothstein's affidavit. In particular, plaintiff averred that Ortho-Nutrix' claim that its stock "was to be issued to me as merely an employment benefit" was untrue. Rather, plaintiff alleged: "The stock was to have constituted a deferred payment for the acquisition of my assets, and was a major inducement to me to enter into the initial agreement with [Ortho-Nutrix]."

Judge Griesa granted defendants' motion to dismiss, holding that the complaint failed to state a cause of action under the federal securities laws and that the pendent jurisdiction claims should therefore be dismissed. Not unreasonably in light of its inept drafting, Judge Griesa construed the complaint as predicating the applicability of the federal securities laws only on the basis that the agreement constituted an "investment contract" under § 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10). He held that the arrangement described above did not constitute an "investment contract" as that term has been defined in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946); *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 581–85 (2d Cir.), *cert. denied sub nom. Hecht v. SEC*, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982); and *SEC v. Glenn W. Turner Enter.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973): since Ms. Yoder was expected to be an active participant in the business, the agreement thus "was not an investment contract, but an employment contract." *Cf. Aqua-Sonic Prods. Corp.*, *supra*, 687 F.2d at 582 (a scheme that is primarily "a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way" is not an investment contract).

■ If the case involved no more than this, we would readily affirm the judge's ruling. However, we are required to read the complaint with great generosity on a motion to dismiss. *See Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957). Indeed, we have previously stated that "it is our duty ... to determine whether the facts set forth justify taking jurisdiction on grounds other than those most artistically pleaded." *Chahal v. Paine Webber, Inc.*, 725 F.2d 20, 23 (2d Cir.1984) (quoting *New York State Waterways Ass'n v. Diamond*, 469 F.2d 419, 421 (2d Cir.1972)). This complaint alleged a contract for the sale of up to 30,000 shares of Ortho-Nutrix stock, conditioned on achieving given levels of sales,[2] as part of the consideration accruing to plaintiff for her sale of the assets of Healthful Living and her entering into the employ of Ortho-Nutrix. Stock is indubitably a security within the definitions of the Securities Act, 15 U.S.C. § 77b(1), and the Securities Exchange Act, *id.* § 78c(a)(10); indeed, as the Fifth Circuit observed recently, it is "the paradigm of a security." *Daily v. Morgan*, 701 F.2d 496, 500 (5th Cir.1983). There was thus no occasion for the plaintiff to rely on the concept of an "investment contract" in order to state a claim under the antifraud provisions of the federal securities laws. As said in *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), the use of the term "investment contract" in the legislation was part of Congress' effort to reach beyond "the obvious and commonplace" to include "[n]ovel, uncommon, or irregular devices, whatever they appear to be, ... if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts' ...." *Id.* at 351, 64 S.Ct. at 124.

---

**2.** Although the "tentative agreement" speaks of "stock options" as well as of "stock," *supra* note 1, it seems plain from the fact that no price is mentioned that, as the complaint alleged, the stock was to be issued without any payment by plaintiff.

The fact that the contract between plaintiff and Ortho-Nutrix was not an "investment contract" is inconsequential if the transaction constituted a sale of stock.

■ The agreement alleged between the plaintiff and the defendants constituted a sale of stock under the securities statutes even though the Ortho-Nutrix stock was not in fact sold. Section 2(3) of the Securities Act provides that "[t]he term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value;"[3] § 3(a)(14) of the Securities Exchange Act similarly provides that "[t]he terms 'sales' and 'sell' each include any contract to sell or otherwise dispose of." Thus, a contract for the issuance or transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed. *See International Controls Corp. v. Vesco,* 593

F.2d 166, 181 n. 18 (2d Cir.), *cert. denied,* 442 U.S. 941, 99 S.Ct. 2884, 61 L.Ed.2d 311 (1979). It is likewise immaterial that Ortho-Nutrix' obligation to deliver the stock was conditional on the attainment of given levels of sales. *Cf. Mount Clemens Indus., Inc. v. Bell,* 464 F.2d 339, 345–46 & n. 11 (9th Cir.1972).[4] Since the contract between Ms. Yoder and Ortho-Nutrix thus falls within the letter of these statutes, the transaction is covered by them unless the introductory phrase of the definitional sections, "unless the context otherwise requires," demands that stock contracted to be sold to a person as an inducement to accept employment should be treated differently from stock contracted to be sold for cash or other consideration.

Our decisions have indeed recognized the importance of this introductory phrase in certain situations. *See, e.g., Exchange Nat'l Bank of Chicago v. Touche Ross &*

---

**3.** Our references in this opinion to the Securities Act are not intended as taking any position on the question whether there is an implied cause of action for damages for violation of § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a). There is a split among the circuits that have addressed this question; *compare, e.g., Shull v. Dain, Kalman & Quail, Inc.,* 561 F.2d 152, 159 (8th Cir.1977) (no private cause of action), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978) *and Landry v. All American Assurance Co.,* 688 F.2d 381, 389–91 (5th Cir.1982) (same) *with Newman v. Prior,* 518 F.2d 97, 99 (4th Cir.1975) (private cause of action exists); and the Supreme Court has reserved answering the question no less than three times, *see Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 733 n. 6, 95 S.Ct. 1917, 1924 n. 6, 44 L.Ed.2d 539 (1975); *International B'hd of Teamsters v. Daniel,* 439 U.S. 551, 557 n. 9, 99 S.Ct. 790, 795 n. 9, 58 L.Ed.2d 808 (1979); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 685 n. 2, 74 L.Ed.2d 548 (1983). In *Kirshner v. United States,* 603 F.2d 234, 241 (2d Cir.1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), this court held, in an opinion characterized by Professor Loss as being "with no analysis," Fundamentals of Securities Regulations 1149 (1983), that there was such a cause of action. This conclusion may be open to reexamination, however, in the light of the subsequent Supreme Court decisions noted above and Professor Loss' comparison of the differences among the provisions for civil liability contained in the 1933 and 1934 Acts, and his analysis of the legislative history of § 17. *See* Loss, *supra,* at 1148–50; *see also* 3 Bromberg & Low-

enfels, Securities Law § 8.5 (330)–(338) (1982). Here, as in so many instances, § 10(b) of the Securities Exchange Act and Rule 10b–5 afford plaintiff the same relief as would § 17(a) of the Securities Act. *See SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 867–68 (2 Cir.1968) (Friendly, J., concurring), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

**4.** We perceive no reason why a contingency attached to a contractual right to acquire stock should remove that right from securities law coverage simply because it increases the risk that plaintiff will not obtain the shares. In *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), the Supreme Court held that "a pledge of stock is equivalent to a sale for purposes of the antifraud provisions of the federal securities laws," although no stock would change hands unless the pledgor defaulted on the loan. *Id.* at 554 n. 2, 102 S.Ct. at 1222 n. 2; *see also Rubin v. United States,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); *Mallis v. FDIC,* 568 F.2d 824 (2d Cir.1977), *cert. dismissed,* 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978); *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 939–40 (2d Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). We intimate no opinion as to whether contingencies that make the possibility of obtaining stock extremely speculative may preclude coverage. *Cf. International B'hd of Teamsters v. Daniel, supra,* 439 U.S. at 562, 99 S.Ct. at 797 (possibility of sharing asset earnings of pension plan too speculative to make pension benefit in employment contract an "investment contract").

Co., 544 F.2d 1126, 1131–39 (2 Cir.1976); *Chemical Bank v. Arthur Andersen & Co., supra* note 4, 726 F.2d at 937–39. We have also acknowledged that the Securities Exchange Act "is for the protection of investors, and its provisions must be read accordingly." *Zeller v. Bogue Electric Mfg. Corp.*, 476 F.2d 795, 800 (2 Cir.), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973) (dictum) (quoted in *Exchange Nat'l Bank of Chicago, supra*, 544 F.2d at 1134); *see also Wilko v. Swan*, 201 F.2d 439, 445 (2d Cir.) ("The purpose of the Securities Act of 1933 is to protect investors"), *rev'd on other grounds*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953); *Movielab, Inc. v. Berkey Photo, Inc.*, 452 F.2d 662 (2d Cir.1971); *Lank v. New York Stock Exchange*, 548 F.2d 61, 65 (2d Cir.1977) ("The beneficiary of the 1934 legislation was intended to be the public investor"). However, we have not rigorously applied that concept as one that limits the reach of the Act, *see, e.g., A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 396–97 (2d Cir.1967), nor, what is more important, has the Supreme Court, *see, e.g., Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10–12, 92 S.Ct. 165, 167–169, 30 L.Ed.2d 128 (1971); *Rubin v. United States, supra* note 4, 449 U.S. at 429–31, 101 S.Ct. at 701–02. We see no reason why "the context requires" us to hold that an individual who commits herself to employment by a corporation in return for stock or the promise of stock should not be considered an investor. Although this situation doubtless was not in the forefront of the mind of the 73d Congress, we perceive no reason why that Congress should have wished the courts to exclude from the benefit of facially applicable language a person who parts with his or her established way of life in return for a contract to issue stock. As the Supreme Court has noted in a similar context, "[t]he economic considerations and realities present ... are similar in important respect[s] to the risk an investor undertakes when purchasing shares. Both are relying on the value of the securities themselves, and both must be able to depend on the representations made by the transferor of the securities ...." *Rubin, supra* note 4, 449 U.S. at 431, 101 S.Ct. at 702.

In *Collins v. Rukin*, 342 F.Supp. 1282 (D.Mass.1972), the court dealt with a situation quite similar to this one, except for the immaterial distinction that the contract involved stock options as well as stock, *see supra* note 2. Like Ms. Yoder, the plaintiff there alleged that he was induced to accept employment with the defendant at least partly on the basis of the latter's promises of stock and stock options. In a thorough opinion the court held that a complaint alleging fraudulent misrepresentation as to the value of the stock stated a claim under Rule 10b–5, saying:

> No compelling reason has been suggested to this Court why one who, in the interest of promoting his company and employing the most talented people in a particular field, engages in fraudulent practices in connection with the offer or sale of securities should enjoy any greater freedom from the operation of the federal securities laws than one who perpetrates a fraud without promotional or employment motive.

*Id.* at 1287–88 (footnote omitted). The court also held that the plaintiff's acceptance of employment and subsequent performance of services satisfied the requirement of value imposed expressly by the Securities Act and assumed also to be imposed by the Securities Exchange Act. 342 F.Supp. 1290. Although *Niederhoffer, Cross & Zeckhauser, Inc. v. Telstat Sys., Inc.,* 436 F.Supp. 180 (S.D.N.Y.1977), dismissed a complaint that alleged a violation of § 10(b) from defendants' failure to pay plaintiff in securities for work performed for defendants under F.R.Civ.P. 12(b)(6), its reasoning gives the *Collins* decision added weight. In *Niederhoffer*, a "finder" in the field of corporate acquisitions alleged breach of an agreement that it would receive a portion of the securities of any corporation that acquired the defendant. The fraud alleged had nothing to do with any particular security but related only to defendants' intention not to comply with

the agreement. Judge Conner expressly agreed with *Collins v. Rukin, supra,* saying:

> *Collins v. Rukin, supra,* upon which plaintiff relies, involved a very different set of circumstances. The plaintiff there was offered a stock option by the defendant corporation as an inducement to accept employment. In becoming a party to the option contract—through his acceptance of the offer of employment—the plaintiff was banking upon the continued financial health of the corporation. His interest as an investor could hardly have been clearer.

436 F.Supp. at 186.

■ In fact, this case does not require us to hold that an action under Rule 10b–5 can be maintained whenever sufficient allegations of fraudulent misrepresentations are made relating to stock where the plaintiff merely promises to work for a defendant in return for the latter's promise to issue stock, whether with or without the payment of a salary—although, as developed above, we see little reason for not holding to that effect. Here the complaint alleged that Ms. Yoder also transferred assets to Ortho-Nutrix, to wit, the name "Healthful Living," its mailing list, copyrights on various publications, allergy-free recipes, special diet plans, sources of allergy-free ingredients, programs for the management of multiple food allergies and materials and proprietary information necessary to develop a computerized allergy-free diet program. In order to affirm the dismissal of her complaint, we should thus have to hold not merely that the "context requires" that

the antifraud provisions not apply to stock contracted to be issued as compensation for services performed in connection with an employment relationship, but also that it requires holding them inapplicable to situations where an employment relationship forms a part of the consideration for a contract to sell stock although assets are also transferred. This we are quite unprepared to do.[5]

■ Appellees argue in the alternative that the complaint was properly dismissed on a ground which the district court did not reach, namely, that the complaint did not plead fraud with sufficient particularity, as required by F.R.Civ.P. 9(b). We have held that the specificity requirement of Rule 9(b) is satisfied by allegations that identify who made the misstatements, the occasions on which these were made and the content of the misstatements. *Zerman v. Ball,* 735 F.2d 15, 22 (2d Cir.1984). While the allegations in the cause of action relating to the violation of the federal securities laws might be insufficient in the last respect if taken alone, the state law cause of action for fraud alleged that defendants' representations as to the ability of Ortho-Nutrix to provide the financial resources necessary to develop a computer-diet program and service Healthful Living customers were false when made and known to be so in that defendants knew or should have known that Ortho-Nutrix was in serious financial difficulties and was unlikely to have sufficient funds in the foreseeable future to meet its obligations to plaintiff. These allegations were sufficient to state a claim that Ortho-Nutrix stock was not the

---

**5.** We do not need here to rely on our decision in *Golden v. Garafalo,* 678 F.2d 1139 (2 Cir.1982), which held that acquisition of a business by the purchase of stock is subject to the securities laws, even though the transaction could have been accomplished by a purchase of the assets. Here there was no way in which Ms. Yoder could be given an equity position in Ortho-Nutrix except by her acquisition of its stock. The conflict among the circuits over the sale of business doctrine at issue in *Golden, compare, e.g., Coffin v. Polishing Machines, Inc.,* 596 F.2d 1202 (4th Cir.) (sale of business is covered), *cert. denied,* 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979); *Cole v. PPG Indus., Inc.,* 680 F.2d 549 (8th Cir.1982) (same); *Daily v. Morgan,* 701 F.2d 496 (5th Cir.1983) (same) *and Ruefenacht v. O'Halloran,* 737 F.2d 320 (3d Cir.1984) (same) *with King v. Winkler,* 673 F.2d 342 (11th Cir. 1982) (sale of business is not covered); *Sutter v. Groen,* 687 F.2d 197 (7th Cir.1982) (same); *Christy v. Cambron,* 710 F.2d 669 (10th Cir.1983) *and Landreth Timber Co. v. Landreth,* 731 F.2d 1348 (9th Cir.1984), is currently awaiting resolution by the Supreme Court. *See Landreth Timber Co., supra,* 731 F.2d 1348, *cert. granted,* —— U.S. ——, 105 S.Ct. 427, 83 L.Ed.2d 354 (1984); *Ruefenacht v. O'Halloran, supra,* 737 F.2d 320, *cert. granted,* —— U.S. ——, 105 S.Ct. 428, 83 L.Ed.2d 355.

sound security it was represented to be. It is elementary that, on a motion to dismiss, a complaint must be read as a whole, drawing all inferences favorable to the pleader. *Conley v. Gibson, supra,* 355 U.S. at 47–48, 78 S.Ct. at 102–103. When such a generous reading is given to this complaint, it was adequate to survive a Rule 9(b) motion to dismiss on the ground of insufficient particularity. *See Credit & Finance Corp. Ltd. v. Warner & Swasey Co.,* 638 F.2d 563, 566 (2d Cir.1981). Moreover, the Ortho-Nutrix quarterly reports to the SEC attached as exhibits to the affidavit of plaintiff's attorney in support of plaintiff's motion for a preliminary injunction indicate that the complaint could readily have been amended to afford greater particularity, and we have little doubt that the district court should and would have permitted an amendment if it had reached the issue here discussed. *See Goldberg v. Meridor,* 567 F.2d 209, 213 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); *Ross v. A.H. Robins Co.,* 607 F.2d 545, 547, 557–59 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).[6] On remand, the court should afford plaintiff an opportunity to do this.

The order dismissing the complaint is reversed and the case is remanded for further proceedings consistent with this opinion.

---

**6.** Professors Moore and Lucas point out that complaints dismissed for failure to satisfy Rule 9(b) are "almost always" dismissed with leave to amend. 2A Moore & Lucas, Moore's Federal Practice ¶ 9.03 at 9–34 (2d ed. 1984). In cases where such leave was not granted, the plaintiff had already been afforded at least one opportu-

nity to plead fraud with greater specificity. *See, e.g., Denny v. Barber,* 576 F.2d 465, 470–71 (2d Cir.1978); *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982); *Armstrong v. McAlpin,* 699 F.2d 79, 93–94 (2d Cir.1983). The plaintiff here has not sought to amend her complaint even once.