James David **DUBIN**, Plaintiff,

v.

The E.F. **HUTTON GROUP INC.**, E.F. Hutton & Company Inc., Defendants.

No. 88 CIV. 0876 (PKL).

United States District Court, S.D. New York.

Sept. 7, 1988.

Royer, Shacknai & Mehle, Washington, D.C., for plaintiff; Roger W. Mehle, of counsel.

Willkie Farr & Gallagher, New York City, for defendants; Louis A. Craco, Jonathan P. Wolfert, Jonathan D. Bassett, of counsel.

## OPINION AND ORDER

LEISURE, District Judge:

In early December 1987, Shearson Lehman Brothers Holdings Inc. entered into a negotiated agreement to merge with E.F. Hutton Group Inc. On December 7, 1987, Shearson commenced a tender offer for Hutton. The offer, as amended, closed at midnight on January 12, 1988. Thereafter, Shearson acquired ninety percent of the outstanding shares of Hutton common stock, and the contemplated merger was consummated on April 29, 1988.

This action is brought by plaintiff James David Dubin, a former E.F. Hutton Senior Vice President whose employment was terminated by Hutton on December 16, 1987, allegedly in anticipation of the Shearson–Hutton merger. In this action, plaintiff seeks to recover the value of 10,000 shares of Hutton stock, from Hutton's Equity Ownership Plan, allegedly owed to him pursuant to the terms of his employment agreement with the firm. Plaintiff has alleged five causes of action under the federal securities laws, including (I) failure to register the relevant securities in violation of Section 12(1) of the Securities Act, 15 U.S.C. § 77$l$(1); (II) securities fraud in violation of Section 12(2) of the Securities Act, 15 U.S.C. § 77$l$(2); (III) securities fraud in violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); (IV) securities fraud in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. 240.10b–5; and (V) securities fraud in violation of Section 15(c)(1) of the Exchange Act, 15 U.S.C. § 78$o$(c)(1), and SEC Rule 15c1–2, 17 C.F.R. 240.15c1–2. Plaintiff also has made two pendent state law claims for common law fraudulent misrepresentation and common law breach of contract.

The defendants have now moved, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), to dismiss the complaint for failure to state a claim under the federal securities laws.

## FACTUAL BACKGROUND

Plaintiff alleges as follows [1]:

Plaintiff James David Dubin is a New York resident. Defendants E.F. Hutton & Company, Inc. ("Hutton") and the E.F. Hutton Group, Inc. ("EFH") are Delaware corporations with principal places of business in New York. Hutton is a registered broker-dealer under Section 15 of the Exchange Act, 15 U.S.C. § 78o.

On or about March 4, 1987, Richard S. Locke, an Executive Vice President of EFH and a Senior Executive Vice President and Managing Director of Hutton, contacted plaintiff by telephone to solicit his interest in employment with Hutton. At that time, plaintiff was employed as an Executive Vice President of Wertheim Schroeder & Co., Inc. Plaintiff worked in New York as head of Wertheim Schroeder's public finance department.

Plaintiff met Locke on March 6, 1987, to discuss Locke's employment proposal. During this meeting, Locke indicated that he wished to hire plaintiff to oversee Hutton's Public Power and Resource Recovery Group, which operated within Hutton's Public Finance Division. In order to persuade plaintiff to join Hutton, Locke offered not only a higher salary and bonus than plaintiff was receiving from Wertheim Schroeder, but also offered plaintiff 10,000 shares of EFH stock, which would be "awarded to Dubin under Hutton's Equity Ownership Plan ... immediately upon his employment." Complaint at ¶ 7. Plaintiff had no equity interest in Wertheim Schroeder. Locke told plaintiff that the Hutton Equity Ownership Plan stock that he was being offered "would be subject to periodic vesting over six years, so that [plaintiff's] continued employment with EFH for that time was necessary for him ultimately to receive all 10,000 shares." Complaint at ¶ 8. Locke allegedly represented that "all 10,000 of Dubin's shares would vest if

there were a takeover of Hutton by another owner." Complaint at ¶ 9. According to the Complaint, this representation allayed plaintiff's concern about a possible loss of stock in the event his employment were to be terminated in connection with such a takeover.

Plaintiff did not accept Locke's offer of employment at the March 6 meeting, but told Locke he would consider the offer. On March 10, 1987, another inconclusive meeting between plaintiff and Locke took place. The discussion on that day focused on the bonus component of plaintiff's proposed compensation. On March 11, 1987, Locke made a new employment offer to plaintiff by telephone, the terms of which were identical to those of the March 6 offer, except that the bonus was higher. Plaintiff accepted the employment offer at that time.

On March 16, 1987, plaintiff received a letter from Locke, dated March 12, which confirmed the terms of the employment offer plaintiff had accepted. The letter stated, in relevant part:

> I am pleased to confirm my offer to you to join E.F. Hutton as Senior Vice President, responsible for the Public Power Group of our Public Finance Division and reporting directly to me.

> You will receive a base salary of $150,000 annually, and a guaranteed bonus of $400,000 for your first year of employment payable in the first quarter of 1988. We are recommending that the Compensation Committee of Hutton's Board of Directors approve your participation in our Equity Ownership Plan for an award of 10,000 deferred shares and 5,000 stock options. Of course, you will also be entitled to participate in all our officer-level benefits programs, which are described in the enclosed summary.

---

1. On a motion to dismiss, the complaint must be read generously and every reasonable inference drawn in favor of the plaintiff. *Pross v. Katz*, 784 F.2d 455, 457 (2d Cir.1986); *Metzner v. D.H. Blair & Co., Inc.*, 663 F.Supp. 716, 719 (S.D.N.Y. 1987). The complaint thus should only be dismissed if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957); *Stone v. Chung Pei Chemical Industry Co. Ltd.*, 790 F.2d 20, 22 (2d Cir.1986). Indeed, it is the Court's duty "to determine whether the facts set forth justify taking jurisdiction on grounds other than those most artistically pleaded." *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 558 (2d Cir.1985) (citations omitted).

*See* Complaint, Exhibit A. With respect to the Equity Ownership Plan, the benefits summary attached to Locke's letter stated:

*Equity Ownership Plan (EOP):* As a key executive, you are eligible to participate in the EOP as recommended by management and approved by the Compensation Committee of the Board. This Plan is designed to align our executives' objectives with those of our shareholders, and to reward individual and team performance on a long term basis. The EOP provides for grants, which vest over a six year period, of (1) Equity Options granted as either incentive stock options (ISOs) or non-qualified options (NQSOs), and/or (2) Equity Shares which may be granted as restricted stock, deferred stock or deferred stock units.

*See* Complaint, Exhibit A.

As of March 16, 1987, plaintiff commenced his employment at Hutton. Up to this point, plaintiff was not furnished with a copy of the Equity Ownership Plan, a prospectus of the Plan, or any written description of the Plan, other than that contained in the benefits summary. Plaintiff claims that his only other knowledge of the Plan came from what Locke had told him during the discussions leading to his employment.

On June 22, 1987, plaintiff received an inter-office memorandum from John Tuosto of Hutton, *see* Complaint, Exhibit C, advising plaintiff that on April 3, 1987, the Compensation Committee of EFH's Board of Directors had awarded him 5,000 deferred shares as an Equity Grant under the Equity Ownership Plan, and a "Nonqualified Equity Option" of 2,500 shares at $41.75 per share. The award of deferred shares represented one-half of plaintiff's total award eligibility under the plan, and the memorandum indicated that plaintiff "will be eligible to receive the remaining fifty percent over the next five years." A prospectus for the Plan, dated May 6, 1985, and an "Equity Grant Agreement" relating to the Plan, accompanied the memorandum. The prospectus provided that equity shares of the type plaintiff had been awarded would vest after six years, and that vesting

of such shares would be accelerated for all holders in the event of a Hutton "change of control." The prospectus also provided for a cash payment of a "change of control price" to holders of such shares within thirty days of the date of the change of control. The prospectus stated, however, that the Board of Directors could vote to determine that a change in ownership would not be considered a "change of control" for purposes of the Equity Ownership Plan. The prospectus also provided that an "audit committee" appointed by the Board of Directors could, "in its discretion, accelerate or otherwise amend the time or times any or all outstanding equity options are exercisable, any or all equity shares vest, and any or all periods of deferral end, except that no such acceleration or amendment will adversely affect the rights of any participant without the consent of such participant." *See* Complaint, Exhibit C.

On November 6, 1987, plaintiff's responsibilities at Hutton were increased when he assumed managerial control of the Public Enterprise Group, made up of the Public Power/Resource Recovery Group and the New Products Group.

On December 3, 1987, Shearson Lehman Brothers Holding Inc. and EFH announced that Shearson would takeover EFH, through a tender offer to be made by a Shearson subsidiary and a subsequent merger of that subsidiary into EFH. Both the tender offer, when consummated, and the merger, when approved by Hutton shareholders, would have constituted "changes of control" under the Plan. However, pursuant to the terms of a merger agreement between Shearson and EFH, Hutton's Board of Directors became required to determine that the prospective tender offer and ensuing merger not be regarded as "change of control" events for purposes of universal automatic vesting under the Equity Ownership Plan. Hutton's Board of Directors had made the "no change of control" determination required by the merger agreement on December 2, thereby purportedly nullifying the otherwise automatic vesting of all equity interests under the Plan. The Compensation Committee of Hutton's Board of Directors

did vote, in this regard, that "308,000 equity shares under the [Plan] held by certain designated employees mutually agreed upon by the Company and Shearson Holdings (substantially all of which are subject to preexisting contractual provisions which provide for accelerated vesting and exercisability upon a change of control or other events) will vest." Complaint at ¶ 21 (citing EFH's Form 14D–9 filed with the Securities and Exchange Commission on December 7, 1987).

Plaintiff claims that on December 16, 1987, he was advised by Locke that his services with Hutton were no longer desired, because of the overlap of his skills and business relations with those of Shearson personnel. Locke advised plaintiff to vacate Hutton's premises no later than December 18, 1987, which plaintiff did.

On December 28, 1987, plaintiff wrote to Robert P. Rittereiser, Chief Executive Officer of Hutton and EFH, asking for a recognition of his contractual right to 10,000 shares of Equity Ownership Plan stock, which plaintiff alleges was valued at a change of control price of $29.25 per share, or a total value of $292,500. Plaintiff claims that he received no response to his December 28 letter from EFH or Hutton or any of their representatives.

## DISCUSSION

### A. SECURITIES FRAUD UNDER SECTION 10(b) AND SEC RULE 10b–5

Count IV [2] of the Complaint alleges violations of Section 10(b) of the Exchange Act and SEC Rule 10b–5, promulgated thereunder. As defendants note, the anti-fraud provisions of both the Securities Act and the Exchange Act require that any purported fraudulent statement must occur in connection with a "sale", "offer to sell", or "purchase" of a "security." Defendants argue that the distribution to plaintiff of

shares pursuant to the Equity Option Plan, like the distribution of shares pursuant to other employee benefit plans to which a party does not contribute, did not constitute a "purchase" or "sale" of a "security" within the meaning of the federal securities laws.

The Supreme Court has determined that the Securities Act and the Exchange Act do not apply to pension plans to which employees do not contribute and in which employee participation is compulsory. *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). In determining that an employee's interest in such a pension plan cannot be considered a "security," and more specifically cannot be considered an "investment contract," the Court in *Daniel* first found that such a plan does not require the employee "to give up a specific consideration in return for a separable financial interest with the characteristics of a security." *Id.* 439 U.S. at 559, 99 S.Ct. at 796. As the Court stated:

[i]n a pension plan such as this one ... the purported investment is a relatively insignificant part of an employee's total and indivisible compensation package. No portion of an employee's compensation other than the potential pension benefits has any of the characteristics of a security, yet these noninvestment interests cannot be segregated from the possible pension benefits. Only in the most abstract sense may it be said that an employee "exchanges" some portion of his labor in return for these possible benefits. He surrenders his labor as a whole, and in return receives a compensation package that is substantially devoid of aspects resembling a security. His decision to accept and retain covered employment may have only an attenuated relationship, if any, to perceived investment possibilities of a future pen-

---

**2.** This Opinion, for purposes of clarity, will not treat plaintiff's claims in numerical order. To allow a preliminary discussion of "sales" and "securities" as defined in the Securities Act and Exchange Act, the Court will first consider plaintiff's claim in Count IV of the Complaint for relief pursuant to Section 10(b) and SEC Rule 10b–5. This discussion will be followed by a discussion of plaintiff's claims pursuant to Section 15(c) of the Exchange Act (Count V), Section 17(a) of the Securities Act (Count III), and Sections 12(1) and 12(2) of the Securities Act (Counts I and II).

sion. Looking at the economic realities, it seems clear that an employee is selling his labor primarily to obtain a livelihood, not making an investment.

*Id.* at 560, 99 S.Ct. at 797 (footnote omitted).

The Court also found that in the case of a noncontributory, compulsory pension fund, a far larger portion of income comes from employer contributions than from the fund's successful management and investment of its assets. *Id.* at 561, 562, 99 S.Ct. at 797–98. In this regard, the Court observed that preconditions to vesting decrease any "investment" interest an employee might have in the value of a pension funds assets:

[t]he importance of asset earnings in relation to the other benefits received from employment is diminished further by the fact that where a plan has substantial preconditions to vesting, the principal barrier to an individual employee's realization of pension benefits is not the financial health of the fund. Rather, it is his own ability to meet the fund's eligibility requirements. Thus, even if it were proper to describe the benefits as a "profit" returned on some hypothetical investment by the employee, this profit would depend primarily on the employee's efforts to meet the vesting requirements, rather than the fund's investment success. When viewed in light of the total compensation package an employee must receive in order to be eligible for pension benefits, it becomes clear that the possibility of participating in a plan's asset earnings "is far too speculative and insubstantial to bring the entire transaction within the Securities Acts."

*Id.* at 562, 99 S.Ct. at 798 (citation and footnote omitted).

Finally, the Court noted that the existence of the Employee Retirement Income Security Act (ERISA) "severely undercuts all arguments for extending the Securities Acts to non-contributory, compulsory pension plans." *Id.* at 569–70, 99 S.Ct. at 801–02.

Although the holding in *Daniel* is limited to non-contributory, compulsory pension plans, its application has not been limited to such pension plans. For example, the Securities Acts have been deemed not to apply to an employee stock ownership plan (ESOP) which was created in connection with an employee buyout of a corporation. *Bauman v. Bish,* 571 F.Supp. 1054 (N.D. W.Va.1983). In that case, the court found that the stock ownership plan did not involve the offer, sale, or purchase of securities because:

[p]articipation in the ESOP for employees of the proposed company is not voluntary, and is, in a sense, compulsory. Each participant who meets certain minimum hours of service requirements will have stock allocated to his or her account. Thus, there is no affirmative investment decision. More importantly, there is no furnishing of "value" by participating employees. Instead of giving up some tangible and definable consideration, participants earn stock through labor for the employer. The notion that the exchange of labor will suffice to constitute the type of investment which the Securities Acts were intended to regulate was rejected in *Daniel.* Plaintiffs theorize that part of the reduction in wages proposed for employees of the new company (as compared with wages for equivaluent work under [the former company]) satisfies the notion of consideration or value necessary to find a sale of securities under the federal Securities Acts. This is a strained interpretation of the situation. In rejecting this theory, the Court finds that the proposed ESOP is a method of deferring income, not reducing wages or paying for stock.

*Id.* at 1064 (citations omitted).

At least one court has rejected the *Bauman* court's conclusion that the interests in an employee stock option plan cannot be considered "securities." *See Foltz v. U.S. News & World Report, Inc.,* 627 F.Supp. 1143 (D.D.C.1986). In *Foltz,* the Court found that where an employee stock plan is not covered by ERISA, "extension to it of coverage under the securities laws would do violence to no Congressional purpose." *Id.* at 1159. The court found that the

ESOP at issue was not designed merely as a method of deferring income, and concluded "that a plaintiff, who asserts that he would have deferred retirement pending a hoped-for increase in the value of his stock holdings, makes out a claim under Section 10(b) of the 1934 Act." *Id.* at 1161. Citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975), the court observed:

> [w]hat a participant in the stock bonus plan had were voting trust certificates which were redeemable as stock at the termination of the participant's employment, should the [employer] decline its option to repurchase the stock represented by the certificates. In that eventuality, the participant would hold a stock certificate, with which he could do as he wished. Looking then at the plain language of the statute, it would appear that interests in the U.S. News stock bonus plan represent either "stock" or "voting-trust certificates" within the meaning of the securities laws.

*Id.* 627 F.Supp. at 1159 (citations omitted).

In this Circuit, the Court of Appeals has determined that a claim under the federal securities laws was stated in a complaint which alleged that a company knowingly misrepresented its financial condition when it undertook to issue its stock to a person, who, in reliance thereon, became an employee of the company and also transferred certain assets as part of the transaction. *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555 (2d Cir.1985) (Friendly, J.).

Observing that stock is "the paradigm of a security" as defined in the Securities Acts, *id.* at 558 (citation omitted), the Court noted that "a contract for the issuance or transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed." *Id.* at 559. The Court also stressed that:

> It is likewise immaterial that [the defendant's] obligation to deliver the stock was conditional on the attainment of given levels of sales. Since the contract between Ms. Yoder and [the defendant] thus falls within the letter of these stat-

utes, the transaction is covered by them unless the introductory phrase of the definitional section, "unless the context otherwise requires," demands that stock contracted to be sold to a person as an inducement to accept employment should be treated differently from stock contracted to be sold for cash or other consideration.

\*   \*   \*   \*   \*   \*

> We see no reason why "the context requires" us to hold that an individual who commits herself to employment by a corporation in return for stock or the promise of stock should not be considered an investor.... As the Supreme Court has noted in a similar context, "[t]he economic considerations and realities present ... are similar in important respect[s] to the risk an investor undertakes when purchasing shares. Both are relying on the value of the securities themselves, and both must be able to depend on the representations made by the transferor of the securities."

*Id.* at 559–60 (citations omitted). The Court added that it "perceive[d] no reason why ... Congress should have wished the courts to exclude from the benefit of facially applicable language a person who parts with his or her established way of life in return for a contract to issue stock." *Id.* at 560.

The Court, however, drew a distinction in this context between misrepresentations with respect to the value of a security, and misrepresentations with respect to a party's intention to comply with a particular agreement. The Court cited with approval *Collins v. Rukin,* 342 F.Supp. 1282 (D.Mass.1972), which held liable under Rule 10b–5 an employer who induced an employee to accept employment, at least in part on the basis of the employer's promises of stock and stock options, the value of which had been misrepresented. The Court distinguished *Collins* from *Niederhoffer, Cross & Zeckhauser, Inc. v. Telstat Sys., Inc.,* 436 F.Supp. 180 (S.D.N.Y.1977), which dismissed a complaint alleging that the defendants had violated Section 10(b) by failing to pay the plaintiff securities that had

been offered in return for work the plaintiff had performed. In *Niederhoffer*, the plaintiff was a "finder" in the field of corporate acquisitions. That plaintiff claimed the defendant had breached an agreement providing that the plaintiff would receive a portion of the securities of any corporation that acquired the defendant. As the Second Circuit observed, in *Niederhoffer* "[t]he fraud alleged had nothing to do with any particular security but related only to defendants' intention not to comply with the agreement." *Yoder*, 751 F.2d at 560–61. Indeed, the holding in *Yoder* appears to assume that any "fraudulent misrepresentations are made relating to stock," *id.*, and not to some term of performance required by an employment contract.

Plaintiffs allegations in the present case cannot be characterized as falling neatly within fact patterns examined in the relevant precedents. On the one hand, the allegations in the Complaint, when read making all reasonable inferences in favor of plaintiff, state that plaintiff accepted employment at Hutton, at least in part, because Hutton offered plaintiff an interest in Hutton's Equity Ownership Plan. To this extent, *Yoder* would appear controlling. Indeed, insofar as plaintiff suggests that his decision to accept employment related to the value of his interest in the Equity Ownership Plan, plaintiff, like the plaintiffs in *Yoder* and *Collins*, made a decision like that of an "investor," who must be able to depend on the representations made by the transferor of any securities.

But unlike the plaintiff in *Yoder*, plaintiff here was not promised stock—the paradigm "security." 751 F.2d at 558. Rather, plaintiff here was only promised an interest in the Equity Ownership Plan, which itself only provided for "grants, which vest over a six year period, of (1) Equity Options granted as either incentive stock options or non-qualified options, and/or (2) Equity Shares which may be granted as restricted stock, deferred stock or deferred stock units." *See* Complaint, Exhibit A. Although the *Yoder* Court found that in this context the distinction between stock and

stock options is "immaterial," 751 F.2d at 560, interests in the Hutton Equity Ownership Plan, at first glance, appear more like interests in a pension plan than in a stock or a stock option. A more careful examination, however, shows that in the context of the alleged facts, the Hutton Plan can be distinguished from the compulsory, non-contributory pension plan in *Daniel*, to which the Supreme Court found the Securities Acts did not apply.

■ Unlike the pension plan in *Daniel*, and unlike the ESOP in *Bauman v. Bish*, participation in the Hutton Plan here is not compulsory. Key executives at Hutton were "eligible to participate in the" Plan, but such participation was by no means either mandatory or guaranteed. Nor can the Hutton Plan be characterized as wholly "non-contributory." Because any interests in the Plan had to be recommended by management and approved, not insignificantly, by the Compensation Committee of the Board, an executive would expect to make some contribution to the company in return for the stock or stock options offered by the Plan. Indeed, one stated purpose of the Hutton Plan was "to reward individual and team performance on a long term basis." Complaint, Exhibit A. Most importantly, unlike the employees who participated in the pension plan in *Daniel*, the plaintiff here did offer a specific consideration in return for a separable financial interest in the Hutton Plan. Applying the rationale of *Yoder*, plaintiff here, in a very concrete sense, did exchange something of tangible value—he changed his way of life and his job—in return for the stock and stock options available through the Plan. Here, plaintiff alleges that his willingness to accept Hutton's employment offer had a direct relationship to the interest he received in the Plan.

Moreover, unlike the pension plan in *Daniel*, the Hutton Equity Ownership Plan was meant to give to its participants the characteristics of "investors." The Plan itself, which awarded only stock or stock options, was in part "designed to align our executives' objectives with those of our shareholders." Complaint, Exhibit A.

The Hutton Plan, like the *Daniel* pension plan, did, of course, have certain vesting requirements. Two vesting requirements were present: first, an executive's interest in the Plan would not vest for six years, and second, in the event that Hutton would be subject to a takeover, Hutton's board of directors would need to determine that the takeover was not a "change of control." *Daniel* held that the presence of substantial preconditions in the pension plan at issue there "[diminished] [t]he importance of [the pension plan's] asset earnings in relation to the other benefits received from employment." 439 U.S. at 562, 99 S.Ct. at 798. The status of the Hutton Plan preconditions is significantly different. In the context of plaintiff's alleged reasons for accepting Hutton's offer of employment, the conditions to vesting, even if applicable to plaintiff, would not minimize the importance of the Plan's earnings in relation to the other benefits received from his employment. In fact, it is alleged that one of the preconditions was removed in return for plaintiff's acceptance of Hutton's employment offer. According to the Complaint, plaintiff was told his interest in the Plan would vest early, under any circumstances, in the event of a hostile takeover. The Complaint suggests that whatever may have been true of the Plan generally, the substantial preconditions to vesting were adjusted, at least in part, in order to induce plaintiff to accept his employment offer.

Thus, while the distinction between the Hutton Plan and the plan in *Daniel* is not crystalline, plaintiff's interest in the Hutton Plan, under the alleged circumstances, appears appropriately characterized as a "security" which was "sold" to plaintiff. Indeed, even the Securities and Exchange Commission releases cited by defendants suggest that an interest in the Hutton Plan, in the context of the allegations of this case, can be deemed a "security." For example, one such release explains:

> While the stock awarded to employees under the above types of plans [i.e., stock bonus plans, such as employee stock ownership plans] is a security, the staff generally has not required it to be registered. The basis for this position generally has been that there is no "sale" in the 1933 Act sense to employees, since such persons do not individually bargain to contribute cash or other tangible or definable consideration to such plans. It also is justified by the fact that registration would serve little purpose in the context of a bonus plan, since employees in almost all instances would decide to participate if given the opportunity. Similarly, the interests of employees in bonus plans have not been subjected to registration.

Employee Benefits Plans, Securities Act Release No. 6188, 45 Fed.Reg. 8960, 8968 (Feb. 11, 1980). A footnote in that release adds:

> The staff's position generally is applicable only in the context of bonus plans which are made available to a relatively broad class of employees. With respect to stock awarded to, or acquired by, employees pursuant to individual employment arrangements, the staff generally has concluded that such arrangements involve separately bargained consideration, and that a sale of the stock has occurred.

*Id.,* 45 Fed.Reg. at 8968 n. 84.

What these SEC releases suggest, while not binding this Court, is that it is consistent with *Daniel* to deem an interest in the Hutton Equity Ownership Plan to be a "security." These releases also suggest that such a "security" can indeed be "sold" if an individual employee bargains to contribute cash or other tangible or definable consideration to such plans. It appears wholly consistent with these releases to conclude that the exchange of an interest in an employee stock plan in return for the service of an employee can constitute a sale to that employee of a security. Defendants claim that plaintiff's interest in the Hutton Plan was not conveyed until after plaintiff began his employment at Hutton. However, accepting all allegations as true, the Complaint suggests that in fact the interest in the Plan was part of the compensation package which Hutton offered to plaintiff. As the court observed in *Collins v. Rukin, supra,* where the defendant of-

fered a stock option to the plaintiff prior to the existence of an employer-employee relationship, "the option was a *quid pro quo* offered to induce plaintiff to enter into the employ of [defendant]." 342 F.Supp. at 1289.

■ Defendants argue, however, that even if a security was indeed sold to plaintiff, the misrepresentations at issue here did not concern the financial condition of the defendant companies, and instead only concerned the terms upon which defendants allegedly agreed to "sell" an interest under the Plan to plaintiff. However, to the extent that an interest in the Plan constitutes a security, any material misrepresentation about vesting rights would constitute fraud in connection with the sale of a security. Like conditions which restrict the transferability of stock or restrict the exercise of stock of stock option rights, the conditions of the Hutton Plan affecting vesting of stock or stock options substantially affected the value of the security to its holder. Indeed, the terms under which stock would vest, according to the Complaint, substantially affected plaintiff's decision whether to accept Hutton's employment offer—that is, whether to "purchase" the "security." [3]

Defendants argue that plaintiff could not justifiably rely on any assurances made about the Hutton Plan because the prospectus for the Plan stated terms different from those promised to plaintiff. However, assuming the allegations to be true, the Complaint states facts sufficient to show justifiable reliance on the representations about the Plan made to plaintiff, prior to his employment, in order to induce him to accept Hutton's offer. Defendants also claim that plaintiff has not sufficiently alleged a legally cognizable injury for which relief can be granted. Defendants assert that the plaintiff's interest in the Plan was automatically forfeited upon the termination of his employment, well before any "takeover" or "change of control" of Hut-

ton occurred. However, the Complaint suggests that plaintiff was fired specifically because a takeover was going to occur, even if the firing took place technically before the date such a takeover became effective. Plaintiff alleges that he was told "all 10,000 of [his] shares would vest if there were a takeover of Hutton by another owner." Complaint at ¶ 9. If plaintiff was conveniently fired after a takeover was announced, but before such vesting could occur, plaintiff is not barred from asserting the existence of an injury related to misrepresentations about his interest in the Hutton Plan. Moreover, the Hutton Board allegedly determined on December 2, 1987, fourteen days before plaintiff was fired, that the Shearson merger would not be deemed a "change of control" under the plan. Thus, events that might have triggered the early vesting allegedly promised to plaintiff occurred prior to the date plaintiff ended his employment at Hutton.

Therefore, defendants' motion to dismiss Count IV, alleging violations of Section 10(b) and SEC Rule 10b–5, is denied.

### B. SECTION 15(c)(1)

■ It is by now well established that no private right of action is implied by either Section 15(c)(1) of the Exchange Act or SEC Rule 15c1–2, promulgated thereunder. Plaintiff does not dispute that no such private rights of action exist, and therefore Count V of the Complaint is dismissed.

### C. SECTION 17(a)

■ In *Kirshner v. United States*, 603 F.2d 234, 241 (2d Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), the Second Circuit concluded that a private right of action is implied by Section 17(a) of the Securities Act. However, several decisions of the United States Supreme Court have undermined the Second Circuit's assumption that Section 17(a) can be treated similarly to Section 10(b) for pur-

---

**3.** This case is *not* similar to *Niederhoffer, Cross & Zeckhauser, Inc. v. Telstat Sys., Inc., supra,* where all misrepresentations were unrelated to the particular securities in question. *See Yoder,* 751 F.2d at 561. Here, although the alleged

misrepresentations were indeed made in the context of an offer of employment, those misrepresentations allegedly concerned the vesting conditions of the security at issue.

poses of determining whether a private cause of action is implied. *See Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). These cases have also suggested that a more restrictive approach than that applied in *Kirshner* should be used to determine if provisions of the federal securities laws allow private rights of action.

The Court of Appeals has, since *Kirshner*, declined in a particular case to determine whether a private right of action is implied under Section 17(a). *Manufacturers Hanover Trust Company v. Drysdale Securities Corp.*, 801 F.2d 13 (2d Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). In *Yoder*, however, Judge Friendly suggested that the Court's determination in *Kirshner*, that such a private right of action exists, "may be open to reexamination." *Yoder*, 751 F.2d at 559 n. 3.

At least two other circuit courts have determined that no implied private right of action exists under Section 17(a). *See In re Washington Public Power Supply System Securities Litigation*, 823 F.2d 1349 (9th Cir.1987) (*en banc*) (criticizing *Kirshner*); *Landry v. All American Assurance Co.*, 688 F.2d 381 (5th Cir.1982). In this District, several judges have followed the lead of Judge Haight in concluding that *Kirshner* can no longer be deemed controlling with respect to Section 17(a) private actions. *See Ackerman v. Clinical Data, Inc.*, [1985–1986 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 92,207 (S.D.N.Y. July 8, 1985); *The Limited, Inc. v. McCrory Corp.*, 683 F.Supp. 387, 396 (S.D.N.Y.1988) (Carter, J.); *Beres v. Thomson McKinnon Sec., Inc.*, [1987 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 93,395, at 97,072 (S.D.N.Y. Sept. 10, 1987) (Kram, J.); *Anderson v. Lowrey*, 667 F.Supp. 105, 109–10 (S.D.N.Y. 1987) (Sand, J.). *But see Krome v. Merrill Lynch & Co.*, 637 F.Supp. 910 (S.D.N.Y. 1986) (Edelstein, J.); *Morris v. Gilbert*, 649 F.Supp. 1491 (E.D.N.Y.1986); *Andreo v.*

*Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F.Supp. 1362 (D.Conn. 1987).

Like Judge Sand, I am "persuaded by the reasoning of the recent and ever-increasing authority to the effect that there is no such private right [of action under Section 17(a)]." *Anderson v. Lowrey*, 667 F.Supp. at 110. Count III of plaintiff's Complaint is accordingly dismissed.

## D. SECTIONS 12(1) AND 12(2)

■ Defendants move to dismiss plaintiff's claim for relief under Section 12(1) of the Securities Act on the basis of defendants' failure to register the equity grant awarded to plaintiff, as allegedly required by Section 5 of the Act, 15 U.S.C. § 77e. Defendants argue that Hutton was not required to register plaintiff's interest in the Hutton Plan because the deferred shares were not "sold" to plaintiff, and because those shares were exempt from the registration requirements of the Securities Act. With respect to that exemption, the defendants claim that Section 3(a)(2) of the Act, 15 U.S.C. § 77c(a)(2), exempts certain instruments, including stock bonus plans, from the registration requirements of Section 5.

As discussed above, plaintiff's Complaint alleges that a sale of securities occurred when plaintiff accepted Hutton's offer of employment. If the Complaint's allegations are taken as true, then the SEC would not appear to contemplate that the "security"—that is, the stock awarded to plaintiff under Hutton's stock ownership plan—be exempt from registration. Even the SEC releases cited by defendants indicate that where interests in employee option plans have not been required by the SEC staff to be registered, it has been because "generally [there] has been ... no 'sale' in the 1933 Act sense to employees." Employee Benefits Plans, Securities Act Release No. 6188, *supra*, 45 Fed.Reg. at 8968. Such a "sale" is alleged here.

Moreover, defendants do not contest plaintiff's assertion that the text of 15 U.S. C. § 77c(a)(2) indicates that the only stock option plans explicitly exempt from regis-

tration requirements are those interests in a single or collective trust fund issued in connection with a stock bonus, pension, or profit sharing plan. While the statute does give the SEC the power to exempt any interest or participation issued in connection with a stock bonus plan, the parties have not suggested the presence of an SEC rule upon which to base an exemption for the Hutton plan under the circumstances alleged in the Complaint.

Therefore, based on the allegations in the Complaint, defendants motion to dismiss Count I of the Complaint, alleging a failure to register securities, is denied.

Because a sale of securities has been alleged, defendants' motion to dismiss Count II of the Complaint, alleging securities fraud in violation of Section 12(2) of the Securities Act, is also denied.

## E. STATE LAW CLAIMS

Based on the allegations in the complaint, defendants' motion to dismiss Counts VI and VII, alleging common law fraudulent misrepresentation and common law breach of contract, is denied. The Court, in its discretion, will exercise, at this stage in the litigation, pendent jurisdiction over those claims.

## CONCLUSION

Defendants' motion to dismiss is therefore granted in part and denied in part.

As to Count I of the Complaint, alleging a violation of Section 12(1) of the Securities Act, defendants' motion is denied.

As to Count II of the Complaint, alleging a violation of Section 12(2) of the Securities Act, defendants' motion is denied.

As to Count III of the Complaint, alleging a violation of Section 17(a) of the Securities Act, defendants' motion is granted.

As to Count IV of the Complaint, alleging a violation of Section 10(b) of the Exchange Act, and of SEC Rule 10b–5 promulgated thereunder, defendants' motion is denied.

As to Count V of the Complaint, alleging a violation of Section 15(c)(1) of the Exchange Act, and SEC Rule 15c1–2 promulgated thereunder, defendants' motion is granted.

As to Count VI and Count VII of the Complaint, alleging pendent state law claims, defendants' motion is denied.

SO ORDERED.